Exhibit D

```
 1              IN THE UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF CALIFORNIA
 2                CASE NO. 3:19-CV-05711-EMC
 3
 4
      ABANTE ROOTER AND PLUMBING,    )
 5    INC., individually and on      )
      behalf of all others          )
 6    similarly situated,            )
                                     )
 7                  Plaintiff,       )
                                     )
 8    vs.                            )
                                     )
 9    TOTAL MERCHANT SERVICES, LLC,  )
      a Delaware limited liability   )
10    company,                       )
                                     )
11                  Defendants.      )
12
13
14              DEPOSITION OF JASON HEIL
15          TAKEN ON BEHALF OF THE PLAINTIFF
16               VIA VIDEOCONFERENCE
17              ON FEBRUARY 12, 2021
18            11:00 AM - 3:35 PM (CST)
19
20
21
22
23
24
25
                                          Page 1
```

```
 1              *  *   A P P E A R A N C E S   *  *
 2   ON BEHALF OF THE PLAINTIFF:
      TAYLOR T. SMITH
 3    PATRICK H. PELUSO
      WOODROW, PELUSO
 4    3900 East Mexico Avenue
      Suite 300
 5    Denver, Colorado 80210
      (720) 907-7628
 6    tsmith@woodrowpeluso.com
      ppeluso@woodrowpeluso.com
 7    (Via teleconference)
 8
      ON BEHALF OF THE DEFENDANT:
 9   (Total Merchant Services, LLC)
      LAWREN A. ZANN
10    GREENSPOON, MARDER
      200 East Broward Boulevard
11    Suite 1800
      Fort Lauderdale, Florida 33301
12    (954) 333-4345
      lawren.zann@gmlaw.com
13    (Via teleconference)
14
      ON BEHALF OF TRIUMPH MERCHANT SOLUTIONS, LLC:
15    BRANDON M. SMITH
      LAW OFFICES OF BRANDON M. SMITH
16    105 West F Street
      3rd Floor
17    San Diego, California 92101
      (619) 236-8344
18    brandonsmith@brandonsmithlaw.com
      (Via teleconference)
19
20
21   REPORTED BY:
      JOHN Q. MARTIN, II
22    CSR #1940
23
24
25
                                          Page  2
```

```
1               *  *  C O N T E N T S  *  *

2                                           PAGE

3        STIPULATIONS . . . . . . . . . . . .      5

4        DIRECT EXAMINATION BY MR. T. SMITH . . .   6

5        CROSS-EXAMINATION BY MR. ZANN. . . . . .  91

6        JURAT. . . . . . . . . . . . . . . . .   119

7        CORRECTION SHEET . . . . . . . . . . .   120

8        REPORTER'S CERTIFICATE . . . . . . . .   121

9        GENERAL CONCORDANCE. . . . . . . . . .   End

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Stevens-Koenig Reporting, A Veritext Company
303-988-8470

```
 1              *  *   E X H I B I T S   *  *

 2                                                      PAGE

 3        EXHIBIT 1        Subpoena                       17

 4        EXHIBIT 2        Fax                            37

 5        EXHIBIT 3        Sales Addendum                 42

 6        EXHIBIT 4        Rose E-mail                    46

 7        EXHIBIT 5        Zann Letter                    48

 8        EXHIBIT 6        LLC Document                   70

 9        EXHIBIT 7        Smith E-mail                   71

10        EXHIBIT 8        Call Log                       76

11        EXHIBIT 9        Call Log                       78

12        EXHIBIT 10       Call Log                       81

13        EXHIBIT 11       Call Log                       81

14        EXHIBIT 12       Meza E-mail                    84

15

16

17

18

19

20

21

22

23

24

25

                                                    Page  4
```

Jason Heil - February 12, 2021

```
 1      Q.  And what did you do after that?
 2      A.  Then I started a portfolio with them
 3  afterwards.
 4      Q.  What does that mean?
 5      A.  Started selling merchant services with them
 6  more on a partner side.
 7      Q.  Okay.  And how long did you work with them on
 8  the partner side?
 9      A.  Several years.  I can't recall the time
10  because it was a while ago.
11      Q.  Okay.  So, what did you do after you left
12  Allied Card Processing?
13      A.  We had a separate portfolio, and I was working
14  with them on the separate portfolio.
15      Q.  What did you do after that?
16      A.  After that I left and then started a portfolio
17  by myself -- or with some other friends.
18      Q.  And was that portfolio started as part of a
19  business or just you individually working with these
20  individuals?
21      A.  At first individually and then it turned into
22  a business.
23      Q.  What was that business's name?
24      A.  Total Merchant Supplies.
25      Q.  And who are the individuals that started that
```

Stevens-Koenig Reporting, A Veritext Company
303-988-8470

1   business with you?

2       A.   Chris Heil, Jay Sadaat and Nathaniel Aripez.

3       Q.   Can you spell the last two, please?

4       A.   J-A-Y, S-A-D-A-A-T, and then Nathaniel, I

5   believe N-A-T-H-I-N-E-L, and space, A-R-I-P-E-Z.

6       Q.   And what was your role with Total Merchant

7   Supplies?

8       A.   I was just in charge of operations and sales.

9       Q.   And did you start Triumph after you started

10  Total Merchant Supplies?

11      A.   Eventually, yes.

12      Q.   When was that?

13      A.   I can't recall the time exactly, but several

14  years later.

15      Q.   Did you do anything between the time you

16  worked for Total Merchant Supplies and the time you

17  started Triumph?

18      A.   Did I do anything, what do you mean?

19           MR. ZANN:   I'm gong to object, that's vague

20  and ambiguous.

21           You can answer, if you can.

22  BY MR. T. SMITH:

23      Q.   Were you employed anywhere else?

24      A.   No.

25      Q.   You were an owner or partial owner of Total

Page 13

1    Merchant Supplies, is that correct?

2        A.   Correct.

3        Q.   And you're a partial owner of Triumph as well?

4        A.   Correct.

5        Q.   Who else owns a share of Triumph?

6        A.   Chris Heil.

7        Q.   Is that it?

8        A.   Correct.

9        Q.   Have you owned any other businesses?

10       A.   Previously or currently?

11       Q.   Previously.

12       A.   No.

13       Q.   Currently?

14       A.   Yes.

15       Q.   What other businesses?

16       A.   BPO call centers.

17       Q.   That's the name of the business?

18       A.   No.  It's an industry.

19       Q.   Are there various call centers?

20       A.   No.  What do you mean, various?

21       Q.   You said you owned businesses, BPO call

22   centers, correct?

23           MR. ZANN:  Can I ask what the relevance is

24   regarding other businesses that he currently owns?

25   He's here as the claims representative.  I gave you

1          MR. B. SMITH:  I'll join.

2          MR. ZANN:  Do you understand the question,

3    Jason?  If you understand it, answer.

4          THE WITNESS:  Can you repeat it, please.

5    BY MR. T. SMITH:

6      Q.  Yeah.  How would you describe your business

7    relationship with Total Merchant, Triumph's business

8    relationship?

9          MR. ZANN:  Form.

10         THE WITNESS:  I think it's okay, it's good.

11   BY MR. T. SMITH:

12     Q.  What does Triumph do for Total Merchant?

13     A.  Triumph would, if signed a deal that would fit

14   the parameters of Total Merchant, then we would send

15   it to Total Merchant.

16     Q.  What do you mean by "a deal?"

17     A.  A company that was interested in getting set

18   up for credit card processing for lower rates, free

19   equipment, things along that nature.

20     Q.  Okay.  So, you would seek out potential

21   merchants to sell credit card processing, is that a

22   fair characterization of Triumph's business?

23         MR. ZANN:  Object to the form, misstates

24   testimony.

25

                                        Page 26

1    BY MR. T. SMITH:

2        Q.  And if that merchant meets Total Merchant's

3    criteria then Triumph would sell -- or would sign up

4    that merchant for their products and services?

5            MR. ZANN:  Objection, form.  Misstates --

6            THE WITNESS:  Correct.

7    BY MR. T. SMITH:

8        Q.  Are you in regular contact with Total

9    Merchant?  When I say you I mean Triumph.

10       A.  No.

11       Q.  Would Triumph have ever been in regular

12   contact with Total Merchant?

13           MR. B. SMITH:  Vague and ambiguous as to the

14   term regular, lack of foundation.

15           MR. ZANN:  I'll join and add speculative to

16   that mix.

17           THE WITNESS:  Yes.  The question one more

18   time, please?

19   BY MR. T. SMITH:

20       Q.  Has Triumph ever been in regular contact with

21   Total Merchant?

22       A.  Yeah.

23       Q.  Can you describe what contact that would be?

24       A.  E-mail, phone call.

25       Q.  During the time that all the calls were made,

                                            Page 27

1     A.  Throughout the sales process?

2     Q.  Yes.

3          MR. B. SMITH:  Object to the form.

4          THE WITNESS:  No.

5  BY MR. T. SMITH:

6     Q.  I'm sorry, I didn't get that.  Did you say

7  no?

8     A.  Correct, I said no.

9     Q.  So, Triumph's communication with Total

10  Merchant would be just related to the approval of the

11  application?

12     A.  Correct.

13     Q.  And how would you find out if they were

14  approved?

15     A.  Through the portal mentioned.

16     Q.  And then what would happen?

17     A.  Send out equipment and encouraged the people

18  to plug in the credit card processing machine.

19     Q.  Does Triumph send the equipment or does Total

20  Merchant send it?

21     A.  It gets tricky, it depends.  I can send out

22  the equipment sometimes or they can send out the

23  equipment.  But in this case they sent out the

24  equipment.

25     Q.  When you say "in this case" what are you

Page 30

1    regarding the Telephone Consumer Protection Act?

2        A.  No, I don't believe so.

3        Q.  Has Total Merchant provided any marketing

4    materials?

5        A.  I can't recall.

6        Q.  Did Total Merchant permit you to use their

7    name in marketing materials?

8        A.  If we were to sell their services or if we

9    were to send someone to their portfolio, then we would

10   let them know that we were sending them to Total

11   Merchant Supplies.

12       Q.  But you wouldn't have used Total Merchant's

13   name in marketing?

14       A.  No.  We use merchant services in our opening.

15       Q.  Okay.  Does Total Merchant restrict how you

16   can market?

17       A.  I don't know.

18       Q.  How does Total Merchant compensate you?

19       A.  Shared residual and upfront bonuses.

20       Q.  Can you explain those?  Start with the upfront

21   bonuses, how does that work?

22       A.  Like a hundred or two hundred dollars for any

23   equipment that we would sign up, depending on the

24   equipment, obviously.

25       Q.  Okay.

Page 34

1      A.   But then if they didn't activate they would

2    call it back.

3      Q.   What about shared residual, what is that?

4      A.   If they processed then there's a back end

5    split.

6      Q.   And how does that work?

7      A.   You swipe their credit card and we'll make

8    money off the transaction because we would set up

9    transactional fees or bases points to process the

10   transaction.

11     Q.   And Triumph would get a share of those fees?

12     A.   Correct.

13     Q.   And Total Merchant would get a share of those

14   fees?

15     A.   Correct.

16     Q.   And are those ongoing forever?

17     A.   I wouldn't say forever because nothing's

18   forever.

19     Q.   For as long as the client remains a client of

20   Total Merchant?

21     A.   Correct.

22     Q.   Has the method of compensation changed over

23   the course of your relationship?

24     A.   Meaning?  What do you mean?

25     Q.   Has Total Merchant changed it at all or is it

Stevens-Koenig Reporting, A Veritext Company
303-988-8470

1          MR. B. SMITH:  Object to the form.

2          THE WITNESS:  Like the splits or the payments

3   or the buy rates?

4   BY MR. T. SMITH:

5      Q.  Yeah, any term.

6      A.  Yeah.  I'm saying the splits and buy rates.

7      Q.  The splits and buy rates.  And what are

8   those?

9      A.  How we get paid.

10     Q.  It appears that this is a sales representation

11  agreement between Total Merchant and Total Merchant

12  Supplies, is that correct?

13     A.  Yes.

14     Q.  Is this related to Triumph in any way?

15     A.  No.

16     Q.  Is Total Merchant Supplies related to Triumph

17  in any way?

18     A.  No.

19     Q.  Is Total Merchant Supplies still ongoing?

20     A.  No.

21     Q.  It's not.  Do you know when that ended?

22     A.  2018-ish, '17-ish.

23     Q.  And why did that end?

24     A.  A falling out with current partners.

25     Q.  And then after that you started Triumph?

1      A.   Correct.

2      Q.   Did Triumph take over Total Merchant Supplies

3    contract with Total Merchant?

4      A.   No.   Separate agreement.

5      Q.   So, it would have had a separate agreement

6    that looks like this?

7      A.   I believe so.

8      Q.   Did Total Merchant Supplies solicit sales on

9    behalf of Total Merchant?

10     A.   Correct.

11     Q.   Do you know if Total Merchant Supplies

12   terminated their relationship with Total Merchant?

13          MR. B. SMITH:   Object to form.

14          THE WITNESS:   I don't know what they did.

15   BY MR. T. SMITH:

16     Q.   In 2008, after the falling out, did Total

17   Merchant Supplies close completely?

18     A.   Correct.

19     Q.   So, it doesn't exist at all anymore?

20     A.   Correct.

21     Q.   What happened with the accounts with Total

22   Merchant that were managed by Total Merchant

23   Supplies?

24     A.   What do you mean?

25     Q.   Well, you told me that if you make a sale then

Page 40

Jason Heil - February 12, 2021

1    A.  No.

2    Q.  So, they would never reach out and say, this

3  person requested to no longer receive calls, please

4  don't call them anymore?

5        MR. ZANN:  Asked and answered.

6        THE WITNESS:  Correct.

7  BY MR. T. SMITH:

8    Q.  What methods of marketing does Triumph use?

9        MR. B. SMITH:  Object, vague and ambiguous,

10  overbroad as to time.  I guess Jason's familiar we're

11  talking about November of 2018 to July of 2020,

12  correct?

13        MR. T. SMITH:  Yes.

14        THE WITNESS:  What I used to market to get

15  clients?

16  BY MR. T. SMITH:

17    Q.  Yes.

18    A.  Just direct calling.

19    Q.  So, what portion of your business is generated

20  through telemarketing?

21    A.  One hundred percent.

22    Q.  Do you have any --

23    A.  Between those dates?

24    Q.  Between those dates, yes.

25        Between those dates, November of 2018 through

Page 53

1  BY MR. T. SMITH:

2     Q.  Would that dialer be a Vicidial system?

3     A.  Vicidial, yes.

4     Q.  Who would be the telephone service provider

5  associated with any calls you made to the Vicidial

6  system?

7     A.  What do you mean?

8     Q.  Let me rephrase that.  Between November of

9  2018 and July of 2020 Triumph utilized the Vicidial

10  system, is that correct?

11     A.  Correct.

12     Q.  Is that the only system that Triumph would

13  have utilized during that timeframe?

14     A.  Correct.

15     Q.  And when you place a call was there a

16  telephone service provider you would go through, such

17  as AT & T, Verizon, something like that?

18     A.  Yes.

19     Q.  Do you know who it is?

20     A.  VoIP Innovations.

21     Q.  You said you first started working with

22  Poundteam in 2014, is that correct?

23     A.  Yes.

24     Q.  So, at the start of that Poundteam would have

25  an agreement with Total Merchant Supplies, correct?

Page 57

1  calls to?

2     A.  I'm sorry?

3     Q.  Does Triumph maintain any records of prior

4  expressed consent for any of the individuals they

5  would place calls to between --

6     A.  What do you mean by consent?

7     Q.  Consent to place the call.  Did any of these

8  individuals Triumph would call between November of

9  2018 to July of 2020, did any of them consent to

10  Triumph placing a call to them?

11        MR. ZANN:  Object to the form, lack of

12  foundation.

13        THE WITNESS:  I don't understand the question.

14  BY MR. T. SMITH:

15     Q.  Okay.  Where did you get -- where did Triumph

16  get the numbers that they called?

17     A.  Between those dates?

18     Q.  Yes.

19     A.  Infofree.com.

20     Q.  Do you know Infofree's legal name?

21     A.  No.  I just know it's Infofree.com.

22     Q.  Okay.  How did you hear about Infofree?

23     A.  On-line search.

24     Q.  Do you remember when that would have been?

25     A.  No.

Stevens-Koenig Reporting, A Veritext Company
303-988-8470

1    Q.  Do you remember about how long Triumph has

2    utilized Infofree services?

3    A.  For a while.  I can't -- I'm sorry, Taylor, I

4    can't give you an exact date, but --

5    Q.  Can you ballpark it?

6    A.  For a long time.

7    Q.  Did you have an agreement with Infofree?

8    A.  No.

9    Q.  No contract?

10   A.  Not that I recall.  I can't remember.

11   Q.  Did Triumph purchase leads from Infofree?

12   A.  Yeah.

13   Q.  Do you remember how much Triumph paid for

14   those leads?

15   A.  No.

16   Q.  Would any records of payments be within

17   Triumph's possession?

18   A.  I don't know.

19   Q.  Does Triumph still obtain leads from Infofree?

20   A.  No.

21   Q.  Do you remember how Triumph would go about

22   obtaining leads from Infofree?

23   A.  What do you mean?

24   Q.  Like, how did you get leads, how were they

25   obtained?

Page 66

1      A.   They would have it in their website.  You

2  click businesses and then you would click, like, the

3  industry, for example, and then download.

4      Q.   And then what would happen?

5      A.   You'd receive businesses, registered

6  businesses and their phone numbers.

7      Q.   Okay.  And how would you receive it, would

8  they be Excel file?

9      A.   Yeah, Excel, CSV.

10      Q.   What would Triumph do with the list they

11  obtained from Infofree?

12      A.   Triumph would then take the list and upload it

13  into the system to call.

14      Q.   When you say the system are you referring to

15  Triumph's dialing system?

16      A.   I'm referring to Vicidial.

17      Q.   Does Triumph keep records of all of the leads

18  they have obtained from Infofree?

19      A.   Correct.

20      Q.   Where would those be maintained?

21      A.   Inside VT's system, the cloud, whatever it is.

22      Q.   Nowhere else?

23      A.   No.  I mean, when it's downloaded, right, you

24  have it, but I've erased those files, just to be

25  clear.

Stevens-Koenig Reporting, A Veritext Company
303-988-8470

1      Q.  Do you know if Triumph purchased plaintiff's

2    lead information from Infofree?

3      A.  I'm sorry?

4      Q.  Do you know if Triumph purchased plaintiff's

5    lead information from Infofree?

6      A.  Is plaintiff Total?

7      Q.  Plaintiff Abante Rooter.

8          MR. B. SMITH:  Objection, calls for

9    speculation.

10         THE WITNESS:  I mean, I don't know.  We just

11   got it from Infofree.

12   BY MR. T. SMITH:

13     Q.  Okay.

14     A.  I mean, that's not the specific name we looked

15   out for or whatever.  We got a bunch of names and

16   businesses and then I took those businesses --

17     Q.  Did Triumph upload any other phone numbers

18   into the Vicidial system --

19     A.  You're cutting out.  I'm sorry.

20     Q.  Let me start over.  Between November of 2018

21   and July of 2020 would Triumph have uploaded phone

22   numbers from any other source other than Infofree into

23   the Vicidial system?

24     A.  No.

25     Q.  You previously testified that Triumph

Page 68

1    purchased the leads from Infofree, is that correct?

2       A.  Correct.

3       Q.  Does Triumph have a record of those payments?

4       A.  I would have to look.  I don't know.

5       Q.  Is that something you could look for?

6       A.  I would have to check.  I mean, could I, yeah,

7    probably.  I would have to look.  I don't know if we

8    have it.

9       Q.  Between November of 2018 and July of 2020 did

10   Triumph have any procedures in place to ensure that

11   the telephone numbers that were provided by Infofree

12   had consented to be called?

13          MR. B. SMITH:  Object to the form and

14   foundation.

15          THE WITNESS:  What do you mean by consent?

16   BY MR. T. SMITH:

17      Q.  Individuals agreeing to be called?

18          MR. B. SMITH:  Objection to form and

19   foundation.

20          THE WITNESS:  No.

21   BY MR. T. SMITH:

22      Q.  Did Triumph just rely on Infofree to handle

23   everything then?

24      A.  Correct.  That was the service they provided.

25      Q.  And between November of 2018 and July of 2020

Page 69

Stevens-Koenig Reporting, A Veritext Company
303-988-8470

1            MR. B. SMITH:  David, don't take this the
2    wrong way, but I'm going to need some more coffee to
3    get through this deposition.  It's been about two
4    hours.  Can we take like ten or fifteen minutes to go
5    get some?
6            MR. T. SMITH:  Yeah.
7            MR. B. SMITH:  Let's come back in fifteen
8    minutes, 12:15.
9                   (Off the record at 2:02 p.m.)
10                  (Back on the record at 2:21 p.m.)
11           MR. T. SMITH:  I'm going to pull up the next
12   exhibit.
13                  (Whereupon, Plaintiff's Exhibit #8 was
14                   received and marked for identification)
15   BY MR. T. SMITH:
16       Q.  I'm showing you what's been marked Exhibit 8.
17   Do you recognize this exhibit?  I can scroll through
18   it if you want.
19       A.  Yeah, please scroll through it.  Okay.
20       Q.  Do you recognize it?
21       A.  Not entirely, but I think I have an idea what
22   it is.
23       Q.  What's your idea what it is?
24       A.  I'm assuming the records called.
25       Q.  Okay.  I'll scroll to the bottom real quick.

Page 76

1    I'll just point out that it looks like the last call

2    is a record of November 26, 2018.  Do you see that?

3        A.   Uh-huh.

4        Q.   And the first call is November 2nd, 2018.  Do

5    you see that?

6        A.   Yeah.

7        Q.   Would this be all of Triumph's calling data

8    for the year of 2018?

9        A.   I don't know.  I don't think so.

10       Q.   Where would this calling data originally be

11   stored at?

12       A.   In Vicidial.

13       Q.   Would this document represent all calls that

14   Triumph placed through the Vicidial system between

15   November 2nd, 2018 through November 26th of 2018?

16       A.   Yes, I believe so, yes.

17       Q.   Has Triumph downloaded and produced all the

18   calls that it made from Vicidial between November 28th

19   and July 2020?

20       A.   I don't know.  I would have to double-check.

21       Q.   Okay.  Give me a second, I'll move on to

22   Exhibit 9.

23            MR. B. SMITH:  While this pulls up, I don't

24   think it matters, but for Exhibit 8 that you just

25   showed, Abante 478, the way it was produced from

Page 77

```
 1   plaintiffs to TMS was both PDF and CSB file.  Was that
 2   a PDF or CSB that you showed?
 3            MR. T. SMITH:  That was the CSB.
 4            MR. B. SMITH:  Again, I don't think it
 5   matters, I was just curious.
 6                    (Whereupon, Plaintiff's Exhibit #9 was
 7                     received and marked for identification)
 8   BY MR. T. SMITH:
 9      Q.  I'm showing you what's been marked as
10   Exhibit 9.  Do you recognize this?  I'll scroll
11   through it.
12      A.  I mean, I'm assuming it's the same thing.
13      Q.  I'll just direct your attention to the first
14   entry which dates January 21st, 2019, correct?
15      A.  Correct.
16            MR. T. SMITH:  One second.
17   BY MR. T. SMITH:
18      Q.  This is Exhibit 9, open in Excel rather than
19   the CSB.  My question to you is:  Would these calls
20   that were produced, would they have been contained
21   within the Vicidial system as well?
22      A.  Contained, what do you mean?
23      Q.  Like, where would this data have come from?
24      A.  The data would come from Infofree.
25      Q.  The leads you're saying would come from
```

Page 78

1   Infofree, is that what you're saying?

2       A.  Correct.

3       Q.  Are these records of calls?

4       A.  Are these records of calls?

5       Q.  Yes.

6       A.  I believe so, yes.

7       Q.  And where would the records have been stored?

8       A.  Within Vicidial.

9       Q.  Do you know if all the calls within this

10  file, and it's the data for 2019, would be stored in

11  the --

12      A.  I'm sorry?

13      Q.  Do you know if all the data in this file would

14  have been stored in the Vicidial system?

15      A.  I believe so, correct, yes.

16      Q.  This would be an accurate representation of

17  calls that Triumph placed in 2019 through the Vicidial

18  system?

19      A.  Correct.

20      Q.  First off, column H, I'll scroll to the top,

21  it says, phone number.  Do you see that?

22      A.  I do.

23      Q.  What would that column contain?

24      A.  Phone numbers.

25      Q.  Of the person called?

Stevens-Koenig Reporting, A Veritext Company
303-988-8470

1    Q.  Is it fair to say that Triumph placed a call

2    to that telephone number on October 8th, 2019?

3    A.  Yes.

4              (Whereupon, Plaintiff's Exhibit #10 was

5               received and marked for identification)

6    BY MR. T. SMITH:

7    Q.  I'm showing you what's been marked Exhibit 10.

8    Do you recognize this?  I'm happy to scroll through

9    it.

10    A.  I'm assuming it's the same.

11    Q.  Yes.  And the last entry in that is dated

12    July 17th, 2020, correct?

13    A.  Okay.

14    Q.  That's correct, right?

15    A.  Yeah, I see that.

16    Q.  Okay.  Would this document contain all of the

17    calls that Triumph placed between January of 2020 and

18    July of 2017 using the Vicidial system?

19    A.  I believe so.

20    Q.  You're not aware of any other records of calls

21    that you have?

22    A.  Oh, no, no.  It would only be through

23    Vicidial.

24              (Whereupon, Plaintiff's Exhibit #11 was

25               received and marked for identification)

Page 81

1  merchant on the other hand?

2         MR. T. SMITH:  Objection, calls for

3  speculation.

4         THE WITNESS:  When the deal is executed.  When

5  I close the deal.  When we get a deal, and I'm not

6  closing the deal, it's obviously one of the agents,

7  they would close it and then they would place it

8  wherever they saw fit at the time of the conversation

9  for the client.

10 BY MR. ZANN:

11    Q.  Let's just elaborate on that a little bit

12 more, just the process itself.  This is the process

13 I'm envisioning and you tell me if I'm correct or

14 clarify where I'm wrong.  Is that fair?

15    A.  Fair.

16    Q.  A call will be placed by Triumph to a

17 merchant?

18    A.  Correct.

19    Q.  I believe you indicated Triumph would identify

20 itself as, quote, unquote, merchant services?

21    A.  Correct.

22    Q.  And Triumph would then inquire into the needs

23 of the merchant?  And by needs I'm referring to

24 credit card processing needs of the merchant.

25    A.  Right, yeah.

Jason Heil - February 12, 2021

1    Q.   In the course of that communication did

2  Triumph determine which one of any of those five

3  entities we discussed earlier could provide the most

4  cost effective services to the merchant?

5    A.   Correct.

6    Q.   So, ultimately it's Triumph's decision as to

7  which credit card processing company to place the

8  merchant with, is that correct?

9    A.   Right.

10    Q.   And I believe you stated earlier, for merchant

11  applications submitted to TMS, if those were rejected

12  you would attempt to submit those to one of those

13  other credit card processors to provide the service to

14  the merchant?

15    A.   Yeah.

16    Q.   Would that also work in the reverse, wherein

17  if Triumph would submit --

18    A.   Correct.

19         MR. B. SMITH:   Jason, wait for him to finish

20  his question.

21         THE WITNESS:   Sorry, sorry.

22  BY MR. ZANN:

23    Q.   I know you know where I'm going.  I've just

24  got to put it on there for the record.

25         Would that also work in reverse, where if

Page 102

Jason Heil - February 12, 2021

1    Triumph submitted a merchant application to one of

2    the other credit card processors, non Total Merchant

3    credit card processors it was affiliated with at the

4    time, if that was rejected would Triumph then submit

5    that application to TMS to see if TMS would accept

6    it?

7        A.   Correct.

8        Q.   Is there anything in that, I'll call it

9    solicitation process that needs clarification?

10       A.   For me?

11       Q.   In terms of the process as I've laid out, am

12   I correct in the description that I've provided?

13       A.   Yeah, that's a fair statement.

14       Q.   You indicated earlier that Poundteam

15   constructed the Vicidial software on a server that

16   Triumph currently possesses, is that correct?

17       A.   Currently now, yes.

18       Q.   Currently now, right.

19       A.   Correct.

20       Q.   You indicated that the telephone service

21   provider for the Vicidial software was VoIP

22   Innovations, is that correct?

23       A.   Correct.

24       Q.   Do you know what VoIP is?

25       A.   It's voice over IP, it's just the way we're

Page 103

1    Z did not want to be contacted?

2       A.  No, we did not notify them.

3       Q.  I believe you answered this question, but I

4    may not have heard it clearly.  Who is Aleks Mezea?

5       A.  A former employee.

6       Q.  Okay.  So, he's no longer employed with

7    Triumph?

8       A.  No.  And not very long after this, I believe.

9          MR. ZANN:  Taylor, you can put that down.

10   Thank you again.

11   BY MR. ZANN:

12      Q.  As it relates to any of the telephone numbers

13   that Triumph called was any due diligence conducted as

14   to who was being contacted?

15      A.  What do you mean?

16      Q.  Okay.  How about the identity of the call

17   recipient, were you aware of who was going to receive

18   the call?

19      A.  Just business owners from the list we would

20   buy from.

21      Q.  So, let's work off of that when you say the

22   business owners.  Were there certain industries that

23   Triumph was targeting?

24      A.  Yes and no.

25      Q.  Tell me the yes and then tell me the no.

Page 108

Jason Heil - February 12, 2021

```
 1        A.   Yes, we would go after plumbers, auto, HVAC's.
 2   And then no, because we also went after new registered
 3   businesses --
 4        Q.   And which --
 5        A.   -- which wasn't identified by any type of SIC
 6   code.
 7        Q.   And when you say SIC code what are you
 8   referring to?
 9        A.   I just know the acronym.  I don't know what it
10   means.  It's how they identify each particular
11   business.
12        Q.   And by "they" are you referring to Infofree?
13        A.   The industry of leads.
14        Q.   Now, when you would request the contact
15   information for the various businesses in the
16   industries you were looking to contact would you
17   actually take a deeper dive into the businesses
18   themselves?
19             So, for instance, if we use plaintiff as an
20   example, was there a point in time where Triumph
21   conducted any research as it relates to Abante Rooter
22   and Plumbing?
23        A.   No.
24        Q.   Does the same hold true as it relates to the
25   other call recipients?
```

Page 109