1   GREENSPOON MARDER LLP
BETH-ANN KRIMSKY (*pro hac vice admission*)
2   beth-ann.krimsky@gmlaw.com
LAWREN A. ZANN (*pro hac vice admission*)
3   lawren.zann@gmlaw.com
200 East Broward Blvd., Suite 1800
4   Fort Lauderdale, FL 33301
Telephone: 954.527.2427
5   Facsimile: 954.333.4027

6   NOSSAMAN LLP
JAMES H. VORHIS (SBN 245034)
7   jvorhis@nossaman.com
50 California Street, 34th Floor
8   San Francisco, CA 94111
Telephone:     415.398.3600
9   Facsimile:     415.398.2438

10   Attorneys for Defendant TOTAL MERCHANT SERVICES, INC.

11                  UNITED STATES DISTRICT COURT

12                NORTHERN DISTRICT OF CALIFORNIA

13   ABANTE ROOTER AND PLUMBING, INC, a      Case No:  3:19-cv-05711-EMC
California corporation, individually and on
14   behalf of all others similarly situated,      **DECLARATION OF LAWREN A. ZANN
IN SUPPORT OF RESPONSE IN
15                  Plaintiff,                 OPPOSITION TO MOTION FOR CLASS
CERTIFICATION**
16             vs.
Date:          June 10, 2021
17   TOTAL MERCHANT SERVICES, LLC., a      Time:          1:30 p.m.
Delaware limited liability company,           Location:      Courtroom 5, 17th Floor
18
Defendant.                      Date Action Filed: September 11, 2019
19

20

21

22

23

24

25

26

27

28

ZANN DECLARATION IN SUPPORT OF OPPOSITION TO MOTION FOR CLASS CERTIFICATION
58025555.v2

I, Lawren A. Zann, declare as follows:

1. I am a partner at Greenspoon Marder LLP and an attorney of record for Defendant Total Merchant Services, LLC ("TMS") in the above-captioned matter. I am over the age of 18 and can competently testify to the matters set forth herein if called to do so.

2. On or about February 12, 2021, Jason Heil, as a corporate representative of non-party Triumph Merchant Solutions, LLC ("Triumph"), appeared at a deposition and provided testimony on behalf of Triumph in the foregoing matter. Excerpts of Mr. Heil's deposition are attached hereto as Exhibit B.

3. On or about February 24, 2021, Darren McCaffrey, as a corporate representative of TMS, appeared at deposition and provided testimony on behalf of TMS in the foregoing matter. Excerpts of Mr. McCaffrey's deposition are attached hereto as Exhibit C.

4. On or about March 3, 2021, Fred Heidarpour, as a corporate representative of Plaintiff Abante Rooter and Plumbing, Inc., appeared at deposition and provided testimony on behalf of Plaintiff in the foregoing matter. Excerpts of Mr. Heidarpour's deposition are attached hereto as Exhibit D.

5. On or about February 5, 2020, Plaintiff responded to TMS's First Set of Requests for Production and produced documents Bates labelled ABANTE000001 through ABANTE000476 in the foregoing matter. Plaintiff's production Bates labeled ABANTE000001 is attached hereto as Exhibit E. Plaintiff's production Bates labeled ABANTE000419 through ABANTE000428 is attached hereto as Exhibit F.

I declare under the penalty of perjury under the laws of the Unites States of American that the foregoing is true and correct. Executed on May 10, 2021, in Fort Lauderdale, Florida.

/s/ Lawren A. Zann
Lawren A. Zann

ZANN DECLARATION IN SUPPORT OF OPPOSITION TO MOTION FOR CLASS CERTIFICATION
58025555.v2

# EXHIBIT B

1                IN THE UNITED STATES DISTRICT COURT
                  NORTHERN DISTRICT OF CALIFORNIA
2                  CASE NO. 3:19-CV-05711-EMC
3
4
     ABANTE ROOTER AND PLUMBING,     )
5    INC., individually and on       )
     behalf of all others            )
6    similarly situated,             )
                                     )
7                  Plaintiff,        )
                                     )
8    vs.                             )
                                     )
9    TOTAL MERCHANT SERVICES, LLC,   )
     a Delaware limited liability    )
10   company,                        )
                                     )
11                 Defendants.       )
12
13
14                DEPOSITION OF JASON HEIL
15           TAKEN ON BEHALF OF THE PLAINTIFF
16                  VIA VIDEOCONFERENCE
17                  ON FEBRUARY 12, 2021
18             11:00 AM - 3:35 PM (CST)
19
20
21
22
23
24
25

                                        Page 1

```
 1              * *   A P P E A R A N C E S   * *
 2   ON BEHALF OF THE PLAINTIFF:
      TAYLOR T. SMITH
 3    PATRICK H. PELUSO
      WOODROW, PELUSO
 4    3900 East Mexico Avenue
      Suite 300
 5    Denver, Colorado 80210
      (720) 907-7628
 6    tsmith@woodrowpeluso.com
      ppeluso@woodrowpeluso.com
 7    (Via teleconference)
 8
      ON BEHALF OF THE DEFENDANT:
 9   (Total Merchant Services, LLC)
      LAWREN A. ZANN
10    GREENSPOON, MARDER
      200 East Broward Boulevard
11    Suite 1800
      Fort Lauderdale, Florida 33301
12    (954) 333-4345
      lawren.zann@gmlaw.com
13    (Via teleconference)
14
      ON BEHALF OF TRIUMPH MERCHANT SOLUTIONS, LLC:
15    BRANDON M. SMITH
      LAW OFFICES OF BRANDON M. SMITH
16    105 West F Street
      3rd Floor
17    San Diego, California 92101
      (619) 236-8344
18    brandonsmith@brandonsmithlaw.com
      (Via teleconference)
19
20
21   REPORTED BY:
      JOHN Q. MARTIN, II
22    CSR #1940
23
24
25
                                          Page  2
```

Jason Heil - February 12, 2021

```
1              * *  C O N T E N T S  * *

2                                              PAGE

3         STIPULATIONS . . . . . . . . . . . .      5

4         DIRECT EXAMINATION BY MR. T. SMITH . . .   6

5         CROSS-EXAMINATION BY MR. ZANN. . . . . .  91

6         JURAT. . . . . . . . . . . . . . . . .   119

7         CORRECTION SHEET . . . . . . . . . . .   120

8         REPORTER'S CERTIFICATE . . . . . . . .   121

9         GENERAL CONCORDANCE. . . . . . . . . .   End

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Stevens-Koenig Reporting, A Veritext Company
303-988-8470

```
 1                   *  *   E X H I B I T S   *  *

 2                                                     PAGE

 3        EXHIBIT 1        Subpoena                      17

 4        EXHIBIT 2        Fax                           37

 5        EXHIBIT 3        Sales Addendum                42

 6        EXHIBIT 4        Rose E-mail                   46

 7        EXHIBIT 5        Zann Letter                   48

 8        EXHIBIT 6        LLC Document                  70

 9        EXHIBIT 7        Smith E-mail                  71

10        EXHIBIT 8        Call Log                      76

11        EXHIBIT 9        Call Log                      78

12        EXHIBIT 10       Call Log                      81

13        EXHIBIT 11       Call Log                      81

14        EXHIBIT 12       Meza E-mail                   84

15

16

17

18

19

20

21

22

23

24

25

                                             Page  4
```

Jason Heil - February 12, 2021

1          MR. ZANN:  Can you establish for him the dates

2     of the phone calls that are in question that Triumph

3     made.  I don't know if the deponent has that

4     information off the top of his head.

5          MR. T. SMITH:  Sure.  I believe the calling

6     centered between November of 2018 and I believe it was

7     July of 2020.

8          MR. ZANN:  Do you understand the question,

9     Jason?

10         THE WITNESS:  No.  What's the question?

11    BY MR. T. SMITH:

12    Q.  The question is:  Did you own any other

13    businesses between November of 2018 and July of 2020?

14    A.  Yes.

15    Q.  And what were those businesses?

16    A.  Redial.

17    Q.  Can you spell that?

18    A.  R-E-D-I-A-L.

19    Q.  Is that an LLC corporation?

20    A.  LLC.

21    Q.  Any other businesses?

22    A.  No.

23    Q.  Okay.  Is Total Merchant Supplies and Triumph

24    related in any way?

25    A.  No.

                                        Page 16

1      Q.  You said "you want to say."  Is it possible

2  there was someone else?

3      A.  Correct.

4      Q.  Who would that be?

5      A.  Nathaniel Aripez.

6      Q.  But he would no longer be with Triumph?

7      A.  That's correct.

8      Q.  Do you have a job title with Triumph?

9      A.  No.

10      Q.  Just owner?

11      A.  Yeah.

12      Q.  What does Triumph do?

13      A.  Sell merchant services.

14      Q.  Is that all they do?

15      A.  Correct.

16      Q.  And are all the merchant services on behalf of

17  Total Merchant?

18      A.  No.

19      Q.  Okay.  Who are they on behalf of?

20      A.  Various merchant service providers that

21  provide great deals.

22      Q.  Okay.  Do you know how many?

23      A.  I think we have about four or five different

24  relationships.

25      Q.  Is that currently or throughout your

```
1       A.  I don't sell merchant services anymore.

2       Q.  Okay.  Do you know when your relationship with

3    Total Merchant would have ended?

4       A.  It hasn't ended.

5       Q.  So, it's ongoing?

6           MR. ZANN:  Object to the form.

7           THE WITNESS:  Correct.

8    BY MR. T. SMITH:

9       Q.  So, what do you currently do with Total

10   Merchant?

11      A.  Currently?  I'm sorry, can you --

12      Q.  You don't sell credit card processing anymore,

13   is that what you said?

14      A.  Right, correct.

15      Q.  When did that stop?

16      A.  Maybe two years ago.  I mean, it's not a

17   focus.

18      Q.  So, it's not your main job?

19      A.  Correct.

20      Q.  But Triumph is still operational?

21      A.  With one employee.

22      Q.  Is that one employee selling credit card

23   processing systems?

24      A.  More so maintaining accounts because we get

25   customers calling in, but -- yeah.
```

Page 24

1          MR. B. SMITH:  I'll join.

2          MR. ZANN:  Do you understand the question,

3    Jason?  If you understand it, answer.

4          THE WITNESS:  Can you repeat it, please.

5    BY MR. T. SMITH:

6      Q.   Yeah.  How would you describe your business

7    relationship with Total Merchant, Triumph's business

8    relationship?

9          MR. ZANN:  Form.

10          THE WITNESS:  I think it's okay, it's good.

11    BY MR. T. SMITH:

12      Q.   What does Triumph do for Total Merchant?

13      A.   Triumph would, if signed a deal that would fit

14    the parameters of Total Merchant, then we would send

15    it to Total Merchant.

16      Q.   What do you mean by "a deal?"

17      A.   A company that was interested in getting set

18    up for credit card processing for lower rates, free

19    equipment, things along that nature.

20      Q.   Okay.  So, you would seek out potential

21    merchants to sell credit card processing, is that a

22    fair characterization of Triumph's business?

23          MR. ZANN:  Object to the form, misstates

24    testimony.

25

Stevens-Koenig Reporting, A Veritext Company
303-988-8470

1       Q.   What is it?

2       A.   It would be a portal provided by the merchant

3   service providers we have if they had it, and if they

4   didn't we faxed or e-mailed papers to the clients.

5       Q.   Okay.  Did Total Merchant have a system that

6   you would use?

7       A.   Correct, they did have a system.

8       Q.   What was that system?

9       A.   I'm sorry, it's been a while.  I'm sorry, it's

10  not on top of my head.

11      Q.   Okay.  So, what happened after you would

12  submit the application?

13      A.   We would wait for it to be approved.  And if

14  it was approved then we would get it approved and they

15  would receive their equipment.  And if it wasn't

16  approved then we would take it somewhere else to get

17  it approved.

18      Q.   Okay.  Would Triumph have any conversations

19  with Total Merchant --

20      A.   I'm sorry, excuse me one second.  My son is

21  taking out the dogs.

22                    (Off the record)

23  BY MR. T. SMITH:

24      Q.   Throughout the sales process did Triumph have

25  any communication with Total Merchant?

Page 29

1    A.   Throughout the sales process?

2    Q.   Yes.

3         MR. B. SMITH:  Object to the form.

4         THE WITNESS:  No.

5    BY MR. T. SMITH:

6    Q.   I'm sorry, I didn't get that.  Did you say

7    no?

8    A.   Correct, I said no.

9    Q.   So, Triumph's communication with Total

10   Merchant would be just related to the approval of the

11   application?

12   A.   Correct.

13   Q.   And how would you find out if they were

14   approved?

15   A.   Through the portal mentioned.

16   Q.   And then what would happen?

17   A.   Send out equipment and encouraged the people

18   to plug in the credit card processing machine.

19   Q.   Does Triumph send the equipment or does Total

20   Merchant send it?

21   A.   It gets tricky, it depends.  I can send out

22   the equipment sometimes or they can send out the

23   equipment.  But in this case they sent out the

24   equipment.

25   Q.   When you say "in this case" what are you

Page 30

```
 1    charger for my laptop.
 2        Q.  Sure.
 3                 (Off the record 12:44 p.m.)
 4            (Back on the record at 12:46 p.m.)
 5    BY MR. T. SMITH:
 6        Q.  Did Total Merchant provide Triumph any
 7    training in sales?
 8        A.  No.
 9        Q.  Did Total Merchant provide Triumph any
10    in-person training?
11        A.  No.
12        Q.  Did Total Merchant ever have, to your
13    knowledge, any seminars, gatherings or meetings for
14    their ISO's or agents?
15            MR. B. SMITH:  Object to the form.
16            THE WITNESS:  To my knowledge, no.  I don't
17    pay attention to their newsletters.
18    BY MR. T. SMITH:
19        Q.  It's possible they may have.
20            Did Total Merchant provide any training,
21    anything related to telemarketing?
22        A.  I can't recall.
23        Q.  Did Total Merchant provide any sales leads?
24        A.  No.
25        Q.  Did Total Merchant provide any training
```

Stevens-Koenig Reporting, A Veritext Company

303-988-8470

Jason Heil - February 12, 2021

1    regarding the Telephone Consumer Protection Act?

2        A.  No, I don't believe so.

3        Q.  Has Total Merchant provided any marketing

4    materials?

5        A.  I can't recall.

6        Q.  Did Total Merchant permit you to use their

7    name in marketing materials?

8        A.  If we were to sell their services or if we

9    were to send someone to their portfolio, then we would

10   let them know that we were sending them to Total

11   Merchant Supplies.

12       Q.  But you wouldn't have used Total Merchant's

13   name in marketing?

14       A.  No.  We use merchant services in our opening.

15       Q.  Okay.  Does Total Merchant restrict how you

16   can market?

17       A.  I don't know.

18       Q.  How does Total Merchant compensate you?

19       A.  Shared residual and upfront bonuses.

20       Q.  Can you explain those?  Start with the upfront

21   bonuses, how does that work?

22       A.  Like a hundred or two hundred dollars for any

23   equipment that we would sign up, depending on the

24   equipment, obviously.

25       Q.  Okay.

Stevens-Koenig Reporting, A Veritext Company
303-988-8470

```
 1            MR. B. SMITH:  Object to the form.
 2            THE WITNESS:  Like the splits or the payments
 3    or the buy rates?
 4    BY MR. T. SMITH:
 5       Q.  Yeah, any term.
 6       A.  Yeah.  I'm saying the splits and buy rates.
 7       Q.  The splits and buy rates.  And what are
 8    those?
 9       A.  How we get paid.
10       Q.  It appears that this is a sales representation
11    agreement between Total Merchant and Total Merchant
12    Supplies, is that correct?
13       A.  Yes.
14       Q.  Is this related to Triumph in any way?
15       A.  No.
16       Q.  Is Total Merchant Supplies related to Triumph
17    in any way?
18       A.  No.
19       Q.  Is Total Merchant Supplies still ongoing?
20       A.  No.
21       Q.  It's not.  Do you know when that ended?
22       A.  2018-ish, '17-ish.
23       Q.  And why did that end?
24       A.  A falling out with current partners.
25       Q.  And then after that you started Triumph?
```

Stevens-Koenig Reporting, A Veritext Company
303-988-8470

Jason Heil - February 12, 2021

```
 1        A.  Correct.
 2        Q.  Did Triumph take over Total Merchant Supplies
 3   contract with Total Merchant?
 4        A.  No.  Separate agreement.
 5        Q.  So, it would have had a separate agreement
 6   that looks like this?
 7        A.  I believe so.
 8        Q.  Did Total Merchant Supplies solicit sales on
 9   behalf of Total Merchant?
10        A.  Correct.
11        Q.  Do you know if Total Merchant Supplies
12   terminated their relationship with Total Merchant?
13           MR. B. SMITH:  Object to form.
14           THE WITNESS:  I don't know what they did.
15   BY MR. T. SMITH:
16        Q.  In 2008, after the falling out, did Total
17   Merchant Supplies close completely?
18        A.  Correct.
19        Q.  So, it doesn't exist at all anymore?
20        A.  Correct.
21        Q.  What happened with the accounts with Total
22   Merchant that were managed by Total Merchant
23   Supplies?
24        A.  What do you mean?
25        Q.  Well, you told me that if you make a sale then
```

Page 40

1    you continue to get residual income for the processing

2    of credit cards that each of these clients does,

3    correct?

4        A.  Correct.

5        Q.  So, in 2018 what happened to all those

6    clients, did they close their accounts with Total

7    Merchant?

8            MR. ZANN:  That's a misstatement of his

9    testimony, he said 2017 or '18.

10           THE WITNESS:  No, I don't believe they closed,

11   no.

12   BY MR. T. SMITH:

13       Q.  Are they still ongoing?

14       A.  A lot of them fell off.  I don't know.

15   There's still some ongoing, but I don't know how many

16   there are.

17       Q.  Okay.  Were any of the accounts that were sold

18   by Total Merchant Supplies be now maintenanced by

19   Triumph?

20           MR. B. SMITH:  Objection.

21           THE WITNESS:  No, not by Triumph.

22   BY MR. T. SMITH:

23       Q.  Who would they be managed by?

24           MR. B. SMITH:  Objection, form.

25           THE WITNESS:  They would just -- they are not

Page 41

1    BY MR. T. SMITH:

2       Q.  And what are those?

3       A.  I can't recall.

4       Q.  Did they have any involvement in your

5    day-to-day operations?

6       A.  I'm sorry?

7       Q.  Did they have any involvement in your

8    day-to-day operations?

9       A.  No.

10      Q.  When you submit an application for approval

11   to Total Merchant does Total Merchant ever ask for

12   information about the source of the sale?

13      A.  No.

14      Q.  Does Total Merchant limit the territory in

15   which you're allowed to sell in?

16      A.  No.

17      Q.  Would they put any pressure on you to make a

18   certain number of sales in a year?

19      A.  No.

20      Q.  As it relates to your calling practices during

21   the time the calls were made, which was November of

22   2018 to July of 2020, did Total Merchant require you

23   to maintain a do not call list?

24          MR. ZANN:  Objection, foundation.

25          THE WITNESS:  I'm sorry, can you repeat that

                                            Page 51

Jason Heil - February 12, 2021

1    BY MR. T. SMITH:

2        Q.  Would that dialer be a Vicidial system?

3        A.  Vicidial, yes.

4        Q.  Who would be the telephone service provider

5    associated with any calls you made to the Vicidial

6    system?

7        A.  What do you mean?

8        Q.  Let me rephrase that.  Between November of

9    2018 and July of 2020 Triumph utilized the Vicidial

10   system, is that correct?

11       A.  Correct.

12       Q.  Is that the only system that Triumph would

13   have utilized during that timeframe?

14       A.  Correct.

15       Q.  And when you place a call was there a

16   telephone service provider you would go through, such

17   as AT & T, Verizon, something like that?

18       A.  Yes.

19       Q.  Do you know who it is?

20       A.  VoIP Innovations.

21       Q.  You said you first started working with

22   Poundteam in 2014, is that correct?

23       A.  Yes.

24       Q.  So, at the start of that Poundteam would have

25   an agreement with Total Merchant Supplies, correct?

Page 57

1       Q.   Do you remember about how long Triumph has
2    utilized Infofree services?
3       A.   For a while.  I can't -- I'm sorry, Taylor, I
4    can't give you an exact date, but --
5       Q.   Can you ballpark it?
6       A.   For a long time.
7       Q.   Did you have an agreement with Infofree?
8       A.   No.
9       Q.   No contract?
10      A.   Not that I recall.  I can't remember.
11      Q.   Did Triumph purchase leads from Infofree?
12      A.   Yeah.
13      Q.   Do you remember how much Triumph paid for
14   those leads?
15      A.   No.
16      Q.   Would any records of payments be within
17   Triumph's possession?
18      A.   I don't know.
19      Q.   Does Triumph still obtain leads from Infofree?
20      A.   No.
21      Q.   Do you remember how Triumph would go about
22   obtaining leads from Infofree?
23      A.   What do you mean?
24      Q.   Like, how did you get leads, how were they
25   obtained?

Page 66

1     A.   They would have it in their website.  You

2   click businesses and then you would click, like, the

3   industry, for example, and then download.

4     Q.   And then what would happen?

5     A.   You'd receive businesses, registered

6   businesses and their phone numbers.

7     Q.   Okay.  And how would you receive it, would

8   they be Excel file?

9     A.   Yeah, Excel, CSV.

10     Q.   What would Triumph do with the list they

11   obtained from Infofree?

12     A.   Triumph would then take the list and upload it

13   into the system to call.

14     Q.   When you say the system are you referring to

15   Triumph's dialing system?

16     A.   I'm referring to Vicidial.

17     Q.   Does Triumph keep records of all of the leads

18   they have obtained from Infofree?

19     A.   Correct.

20     Q.   Where would those be maintained?

21     A.   Inside VT's system, the cloud, whatever it is.

22     Q.   Nowhere else?

23     A.   No.  I mean, when it's downloaded, right, you

24   have it, but I've erased those files, just to be

25   clear.

Stevens-Koenig Reporting, A Veritext Company
303-988-8470

1       A.   I believe so.

2       Q.   I want to direct your attention to line 239,

3    495.

4       A.   Uh-huh.

5       Q.   Do you see in column H the telephone number

6    925-828-1080, do you see that?

7       A.   Yes, yes.

8       Q.   I'll represent that that's plaintiff's

9    telephone number.

10      A.   The guy you're representing?

11      Q.   Correct.  Is it fair to say that a call was

12   placed on that date to that telephone number, my

13   client?

14      A.   Yes.

15           MR. ZANN:  Object to the form.

16           THE WITNESS:  Yes.

17   BY MR. T. SMITH:

18      Q.   And that would have been June 24th, 2019?

19      A.   If that's what it says, yes.

20      Q.   And I'll direct your attention to row 351,361.

21   Do you see in column H where it says 925-828-1080?

22      A.   Yes.

23      Q.   And the dates associated with that entry would

24   be October 8th, 2019, correct?

25      A.   Yes.

Stevens-Koenig Reporting, A Veritext Company
303-988-8470

Jason Heil - February 12, 2021

1    place them on the DNC.

2       Q.  By asking "do not contact me," would that be

3    sufficient for Triumph to place them on the DNC list?

4       A.  Correct.  We would not be calling.

5          MR. T. SMITH:  Let's take a brief break and

6    then I'll have just a few more questions.  Five

7    minutes.

8              (Off the record at 2:50 p.m.)

9              (Back on the record at 2:54 p.m.)

10   BY MR. T. SMITH:

11      Q.  Previously we discussed Infofree and I believe

12   you testified that Triumph found Infofree by searching

13   on-line, is that correct?

14      A.  Yes.

15      Q.  Did Triumph ever have any communications with

16   Total Merchant regarding Infofree?

17      A.  Any communications, what do you mean by that?

18      Q.  Any e-mails, phone calls, did Total Merchant

19   ever have a conversation regarding related to

20   Infofree?

21      A.  I can't recall at the moment, no.

22      Q.  Did Total Merchant make Triumph aware of

23   Infofree?

24      A.  No.  I don't believe so, no.

25      Q.  Did Total Merchant purchase any leads from

                                             Page 89

1    Infofree for use by Triumph?

2        A.   I'm sorry?  One more time.

3        Q.   Did Total Merchant purchase any leads for use

4    by Triumph through Infofree?

5        A.   Gosh.  I honestly can't recall.  I can't

6    recall at the moment.

7        Q.   Do you recall if Total Merchant ever mentioned

8    in any way Infofree to Triumph?

9            MR. ZANN:  Asked and answered.

10           THE WITNESS:  No, I'm sorry, I don't remember

11   every conversation I've had with them.  It's been a

12   few years.  I'm sorry.  I can't recall it.

13   BY MR. T. SMITH:

14       Q.   How does Triumph maintain records of e-mails?

15       A.   We use Microsoft on-line.

16       Q.   Does Triumph periodically delete e-mails?

17       A.   I mean, yeah, junk mail, right.

18       Q.   Does Triumph delete e-mails like from Total

19   Merchant?

20       A.   No.

21       Q.   Would Triumph have every e-mail they ever

22   received?

23       A.   I mean, I don't know.  I don't know how

24   Microsoft on-line is, but I have the basic package

25   from Microsoft on-line.

Stevens-Koenig Reporting, A Veritext Company
303-988-8470

```
 1        A.   Fair.
 2        Q.   So, do you recall a line of testimony earlier
 3   in today's deposition where you named Harbor Touch,
 4   Elavon, First Data and High Risk for other credit
 5   card processing companies you worked with, you being
 6   Triumph?
 7        A.   Yes.
 8        Q.   And you indicated at the time that you weren't
 9   certain if that was a complete list or not, is that
10   correct?
11        A.   That is correct.
12        Q.   So, the possibility -- again, I know anything
13   is possible, in your words -- but based on that
14   testimony, does the possibility exist that there are
15   more than those four entities I just named, as well
16   as TMS, that Triumph worked with between July 2018 and
17   July 2020?
18        A.   Yeah, absolutely.
19        Q.   And if you recall -- actually, Taylor, I'm
20   going to ask you if you can try, can you pull up,
21   let's go with Exhibit 9, which is the 2019 call data.
22             MR. T. SMITH:  Sure.
23   BY MR. ZANN:
24        Q.   And while he's pulling that up, Jason, the
25   question I'm going to have when that pulls up, is
```

Page 92

1    there any way you can identify on that call data

2    which one of any of those five entities we just named

3    Triumph placed calls on behalf of?

4        A.   No.

5        Q.   And I suppose -- I mean, I won't ask any

6    further questions in that regard, that was pretty

7    definitive.  But I'm going to ask you what some of

8    these things mean.  I think I know what they mean,

9    but I'm going to ask you to clarify for me what it

10   means.

11           If we start in column A you'll see row one,

12   unique ID?

13       A.   Uh-huh.

14       Q.   What does that mean to you?

15       A.   What does it mean to me?  That it's a unique

16   ID for that individual record.

17       Q.   So, you see how rows 1 and 2 share the same

18   unique ID?

19       A.   Yes, I see that now, yes.

20       Q.   Do you know why that is?

21       A.   No, I do not know why that is.

22       Q.   Okay.  So, is it a fair statement, as you sit

23   here today, you're not certain what column unique ID

24   means?

25       A.   Yeah, other than how it sounds.

Stevens-Koenig Reporting, A Veritext Company
303-988-8470

1    merchant on the other hand?

2         MR. T. SMITH:  Objection, calls for

3    speculation.

4         THE WITNESS:  When the deal is executed.  When

5    I close the deal.  When we get a deal, and I'm not

6    closing the deal, it's obviously one of the agents,

7    they would close it and then they would place it

8    wherever they saw fit at the time of the conversation

9    for the client.

10   BY MR. ZANN:

11       Q.  Let's just elaborate on that a little bit

12   more, just the process itself.  This is the process

13   I'm envisioning and you tell me if I'm correct or

14   clarify where I'm wrong.  Is that fair?

15       A.  Fair.

16       Q.  A call will be placed by Triumph to a

17   merchant?

18       A.  Correct.

19       Q.  I believe you indicated Triumph would identify

20   itself as, quote, unquote, merchant services?

21       A.  Correct.

22       Q.  And Triumph would then inquire into the needs

23   of the merchant?  And by needs I'm referring to

24   credit card processing needs of the merchant.

25       A.  Right, yeah.

Page 101

1    Q.  In the course of that communication did

2    Triumph determine which one of any of those five

3    entities we discussed earlier could provide the most

4    cost effective services to the merchant?

5    A.  Correct.

6    Q.  So, ultimately it's Triumph's decision as to

7    which credit card processing company to place the

8    merchant with, is that correct?

9    A.  Right.

10    Q.  And I believe you stated earlier, for merchant

11    applications submitted to TMS, if those were rejected

12    you would attempt to submit those to one of those

13    other credit card processors to provide the service to

14    the merchant?

15    A.  Yeah.

16    Q.  Would that also work in the reverse, wherein

17    if Triumph would submit --

18    A.  Correct.

19        MR. B. SMITH:  Jason, wait for him to finish

20    his question.

21        THE WITNESS:  Sorry, sorry.

22    BY MR. ZANN:

23    Q.  I know you know where I'm going.  I've just

24    got to put it on there for the record.

25        Would that also work in reverse, where if

Page 102

1    Triumph submitted a merchant application to one of

2    the other credit card processors, non Total Merchant

3    credit card processors it was affiliated with at the

4    time, if that was rejected would Triumph then submit

5    that application to TMS to see if TMS would accept

6    it?

7         A.   Correct.

8         Q.   Is there anything in that, I'll call it

9    solicitation process that needs clarification?

10        A.   For me?

11        Q.   In terms of the process as I've laid out, am

12   I correct in the description that I've provided?

13        A.   Yeah, that's a fair statement.

14        Q.   You indicated earlier that Poundteam

15   constructed the Vicidial software on a server that

16   Triumph currently possesses, is that correct?

17        A.   Currently now, yes.

18        Q.   Currently now, right.

19        A.   Correct.

20        Q.   You indicated that the telephone service

21   provider for the Vicidial software was VoIP

22   Innovations, is that correct?

23        A.   Correct.

24        Q.   Do you know what VoIP is?

25        A.   It's voice over IP, it's just the way we're

Page 103

1    talking right now.

2        Q.  I don't mean to paint you as an expert, so if

3    you don't know --

4        A.  I'm not an expert.  I'm far from one.

5        Q.  Fair enough.  Then I'll forgo the questions I

6    have about VoIP for you.  I'll let experts deal with

7    that if they need to.

8        A.  Okay.

9        Q.  You indicated that the numbers in the Vici

10   dialing system were numbers that Triumph uploaded

11   from Infofree, is that correct?

12       A.  Correct.

13       Q.  Was there a situation where Triumph would

14   manually input numbers into the Vici dialing system?

15       A.  What do you mean by manually input?

16       Q.  Sure.  So, how about in the situation where

17   Triumph obtains a merchant, an application is

18   approved by any one of the credit card processing

19   companies that Triumph works with during that time

20   period, would Triumph glue that merchant's telephone

21   number in the Vici dialing system so it could place

22   calls in the future to that merchant?

23       A.  I don't understand the question.  I'm going to

24   assume that if we made contact with somebody and they

25   gave us another phone number, correct?

Page 104

1    Q.   Right.

2    A.   And then we take that phone number and put it

3    in our system to call them?

4    Q.   That's my question to you, would you do that?

5    A.   Yes, we would do that.  That happens all the

6    time.

7    Q.   I was speaking over you.  That's my fault.

8    Did you say that does or does not happen all the

9    time?

10    A.   No, that does happen.  People do request that.

11    Q.   So, if we were to look at the call data that

12    you have produced that we were just discussing with

13    all those columns, are you aware of any indication in

14    that call data of what is a number obtained through

15    Infofree as opposed to the situation we just

16    described, when the merchant provides a different

17    number?

18    A.   No.

19    Q.   Okay.

20    A.   I can't differentiate it, no.

21    Q.   Okay.  Do you know, by you I'm referring to

22    Triumph, does Triumph actually know the contact

23    information for the plaintiff in this case, Abante

24    Rooter and Plumbing?

25    A.   Do I know his contact?

Page 105

1      A.  Yeah.

2      Q.  So, it's not a situation where Triumph would

3   inquire into goods or services or the amounts of goods

4   or services these call recipients performed, is that

5   correct?

6      A.  Correct.

7      Q.  Your relationship with TMS -- and I think it's

8   apparent, but I would like to you clarify -- your

9   relationship with TMS was not exclusive, is that

10  correct?

11     A.  Yeah.

12     Q.  And Triumph was free to conduct business with

13  any other credit card processing entity out there?

14     A.  Correct.  I mean, that's how the industry

15  works.

16     Q.  Sure.  And as it relates to the compensation,

17  did Total Merchant compensate Triumph on an hourly

18  basis?

19     A.  No.

20     Q.  And was that compensation based upon merch and

21  applications accepted by Total Merchant?

22     A.  Accepted and approved, correct.

23     Q.  And along those same lines, did Total Merchant

24  impose a quota upon Triumph concerning the total

25  number of merchants that need to be contacted?

Page 110

Jason Heil - February 12, 2021

1    place telephone calls on behalf of Triumph?

2        A.  No.

3        Q.  Okay.  And the same thing with third parties,

4    did Triumph engage any third parties to place

5    telephone calls between that November 2018 and July

6    2020 time period?

7            MR. T. SMITH:  Objection, asked and answered.

8            THE WITNESS:  Not to my knowledge, not what I

9    remember.

10   BY MR. ZANN:

11       Q.  So, as far as Triumph is aware, all of the

12   calls Triumph placed were placed by its own employees?

13       A.  Correct.

14       Q.  Okay.  Did TMS provide any benefits to Triumph

15   employees?

16       A.  Did Total Merchant Services provide benefits

17   to us?  No, no, they did not.

18       Q.  And similarly, did Total Merchant Services pay

19   the salaries of any Triumph employees?

20       A.  No.

21       Q.  Did Total Merchant pay the rent of Triumph?

22       A.  No.  They didn't pay for anything.

23       Q.  And I'll kind of walk you through that a

24   little bit further.  Did they pay for the Vicidial

25   software system?

                                          Page 113

1      A.   No.

2      Q.   Did they pay for the servers that are

3   currently housed in Tijuana?

4      A.   No.

5      Q.   Did they pay for any office equipment that was

6   used by Triumph?

7      A.   No.

8      Q.   And you've already indicated that they did not

9   provide the leads, so I can cross that off my list.

10   Is that correct?

11      A.   I'm sorry?

12      Q.   I said, was that correct?

13      A.   Your question?  You were just going off.

14      Q.   Did TMS provide any leads to Triumph?

15      A.   No.

16      Q.   Did TMS at any point in time direct Triumph to

17   disregard any contractual obligations Triumph had?

18      A.   What do you mean?

19      Q.   To ignore whatever your contractual

20   obligations were?

21      A.   With who?

22      Q.   Between Triumph and TMS.

23      A.   No.  They didn't tell me to ignore, no.

24      Q.   Did TMS control when Triumph placed telephone

25   calls?

Page 114

1      A.  Did TMS control when we placed phone calls,

2  no.

3      Q.  The actual timing as to the placement of phone

4  calls?

5      A.  No.

6      Q.  Okay.  Does TMS have a shared bank account

7  with Triumph?

8      A.  No.

9      Q.  Can TMS hire employees for Triumph?

10      A.  No.

11      Q.  Fire Triumph employees?

12      A.  No.

13      Q.  And I believe you indicated earlier that TMS

14  did not provide training as it relates to

15  telemarketing?

16      A.  No, they did not.

17      Q.  So, I guess that follows TMS did not train

18  any Triumph employees as it relates to the TCBA?

19      A.  No.

20      Q.  The Vicidial platform that we've discussed,

21  was that platform also used to place calls on behalf

22  of those other four credit card processing entities

23  Triumph is aware of working with?

24      A.  Yeah.

25      Q.  And the leads obtained from Infofree, were

Page 115

Jason Heil - February 12, 2021

1   those leads also used to place calls to any one of

2   those four non TMS credit card processing companies we

3   discussed earlier?

4       A.   Repeat the question.

5       Q.   Sure.   I'm just taking it one step earlier.

6   You agree that the leads Triumph contacted were

7   obtained through Infofree, correct?

8       A.   Correct.

9       Q.   You just told me that Triumph used the same

10  Vici dialing platform to contact merchants related to

11  any of those other four credit card processing

12  companies Triumph worked with, correct?

13      A.   Correct.

14      Q.   I'm curious to know as it relates to the leads

15  obtained from Infofree if the same holds true,

16  meaning, were those leads also used for any one of

17  those other four credit card processing entities?

18      A.   The other vendors, yeah, those leads were used

19  for them as well.

20      Q.   Okay.   The point being that the same software

21  and the same leads used to place calls were not

22  exclusive to Total Merchant, is that correct?

23      A.   That is correct.

24      Q.   Jason, I don't think I have anything else for

25  you.   You clarified what I needed to clarify.

Page 116

# EXHIBIT C

1            UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3

4   ABANTE ROOTER AND PLUMBING,

5   INC., individually and on

6   behalf of all others similarly

7   situated,

8                                      CONFIDENTIAL

9         Plaintiff,

10                                Hon. Edward M. Chen

11  vs                    Case No. 3:19-cv-05711-EMC

12

13  TOTAL MERCHANT SERVICES, LLC, a

14  Delaware limited liability company,

15

16         Defendant.

17                                  /

18

19

20         Deposition of DARREN McCAFFREY, taken in

21  the above-entitled matter before Notary Public, Patricia

22  A. Lutza, CSR, CRR, by Zoom Virtual Video Conference, on

23  Thursday, February 25, 2021, commencing at about 12:00

24  p.m.

25

                                        Page 1

1    APPEARANCES:

2

3        PATRICK H. PELUSO, ESQ.

4        Woodrow & Peluso, LLC

5        3900 East Mexico Avenue

6        Suite 300

7        Denver, Colorado  80210

8        (720) 213-9676

9        ppeluso@woodrowpeluso.com

10

11           Appearing on Behalf of the Plaintiff.

12

13        LAWREN A. ZANN, ESQ.

14        Greenspoon Marder, LLP

15        200 East Broward Boulevard

16        Suite 1800

17        Fort Lauderdale, Florida  33301

18        (954) 333-4345

19        lawren.zann@gmlaw.com

20

21           Appearing on Behalf of the Defendant.

22

23

24

25

                                        Page  2

1   APPEARANCES: (continued)

2

3        EARL JOHNSON, ESQ.

4        Total Merchant Services

5        250 Stephenson Highway

6        Troy, Michigan   48083

7        earljohnson@nabarcard.com

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 3

1                    INDEX OF WITNESSES

2    ------------------------------------------------------------

3        WITNESS                              PAGE

4    ------------------------------------------------------------

5        DARREN McCAFFREY

6    Examination by Mr. Peluso                7

7    Examination by Mr. Zann                  76

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                              Page  4

```
 1                    INDEX OF EXHIBITS

 2     ----------------------------------------------------

 3     EXHIBITS                                        MARKED

 4     ----------------------------------------------------

 5     Exhibit 1  Notice to defendant 30(b)(6) deposition   87

 6     Exhibit 2  Fax of IRS instructions for W9 form       87

 7     Exhibit 3  Sales Compensation Addendum for Sales     87

 8                Representation Agreement between Total

 9                Merchant Services and Triumph Merchant

10                Solutions

11                Dated:  January 15, 2014

12     Exhibit 4  Message from Yvonne Martinez to Sara Rose 87

13                Re:  Log in for Jason Heil

14                Dated:  Nov.  2, 2018

15     Exhibit 5  Total Merchant Services, Marketing and    87

16                Referal Agreement for Purple Advertising

17                Agency

18                Dated:  September 26th, 2018

19     Exhibit 6  Total Merchant Services, Bancard Training 87

20                Agreement document

21     Exhibit 7  Script, Expert Chris, Phone Appointment   87

22     Exhibit 8  Total Merchant Services, Sales Training   87

23                Document

24     Exhibit 9  Total Merchant Services, Rebuttals for    87

25                Existing Businesses

                                                      Page 5
```

```
 1                      INDEX OF EXHIBITS

 2    ----------------------------------------------------------

 3    EXHIBITS                                           MARKED

 4    ----------------------------------------------------------

 5    Exhibit 10 Emails between Andrew Heidarpour and Todd  87

 6               Anderson

 7               Re:  Abante Rooter & Plumbing, Inc., Email

 8               1 of 3

 9               Dated:  Various dates in 2017

10    Exhibit 11 Messages between Fred Poor and Aleks Mesa  87

11               Re:  Free Credit Card Terminal

12               Dated:  June 24 through June 26, 2019

13    Exhibit 12 Total Merchant Services, Free POS Terminal 87

14               Quote

15

16

17

18

19

20

21

22

23

24

25

                                                    Page  6
```

```
 1              January 1, 2019.  This document is referencing the
 2              Triumph name that was established in late 2018 as an
 3              addendum to the Total Merchant Supplies contract
 4              from 2014.
 5    Q.    Right.  I understand.  I want to make sure I
 6              understand what you are saying.  My question is --
 7              let's go back to Exhibit 2.
 8    A.    Okay.  I'm back there now.
 9    Q.    Let's just scroll all the way to the last page again
10              and we are going to read it in reverse.
11    A.    It's still loading.
12    Q.    The same here.  Let me know when it pops up for you.
13    A.    It's still loading.  It's there.
14                   MR. ZANN:  Are you okay going off the
15              record for one moment?
16                   MR. PELUSO:  Sure.
17                   (Discussion off the record.)
18                   MR. PELUSO:  Back on the record.
19    BY MR. PELUSO:
20    Q.    So Exhibit 2, this Sales Representation Agreement,
21              dated January 15, 2014, between Total Merchant
22              Services and Total Merchant Supplies, LLC, is it
23              your understanding that the relationship between
24              Total Merchant Services and Triumph is governed by
25              this contract?
```

Page 21

Darren McCaffrey - February 25, 2021

```
 1   A.    Yes.
 2   Q.    So both Total Merchant Supplies and Triumph are
 3         operating under this agreement?
 4   A.    That's what it appears as, yes.
 5   Q.    Understood.  And is this a form contract?  Do you
 6         know what a form contract is?
 7   A.    No.
 8   Q.    A standard contract that can be used over and over
 9         again with various agents.  So it appears to me to
10         be a form contract because there is just lines left
11         blank where you can handwrite in Total Merchant
12         Supplies or whichever entity you would like to use.
13   A.    Yes, that's correct, it's a form contract.  We would
14         use that with any sales rep that wanted to sign up
15         with us.
16   Q.    Do you know during what period of time this form
17         Sales Representation Agreement would have been used?
18   A.    I don't know that in regards to TMS, I don't know
19         that, because that was before the acquisition.  They
20         were using that before.
21   Q.    Understood.
22              MR. PELUSO:  I am really sorry.  Can we
23         take a two-minute break here.
24              (A short recess was taken.)
25   BY MR. PELUSO:
```

1        where we would need more documents when they submit

2        the deal or what would be prohibited, which means we

3        couldn't accept the merchant application at all.  So

4        what that's saying is it's saying that they are only

5        going to actively go after businesses that would be

6        approved through our underwriting guidelines based

7        on their MCC codes.

8   Q.   How is all of this explained to the SR?  Are there

9        periodic training sessions?  Are there on-boarding

10       seminars when someone becomes an SR?

11  A.   Every SR that we set up has had industry experience,

12       we don't accept the SRs that don't have industry

13       experience so they should already know this, but we

14       do have training sessions and things like that that

15       would cover this if changes were made basically to

16       the prohibited or restricted list, we send out

17       communications that say, Hey, there is a new list,

18       or we have trainings that are held on it if it needs

19       to be gone over with them.

20  Q.   And are these training sessions held at the

21       beginning of the relationship?

22  A.   They can be held at any time.

23  Q.   Okay.  How often would you say that they are held?

24  A.   The training sessions would be more prevalent in the

25       beginning, if you were a new SR signing up with us,

Page 26

```
1    A.    His name is Chuck, C-H-U-C-K; Cullen, C-U-L-L-E-N.

2    Q.    Got it.  Thank you.  Based on the answer you just

3          gave, I am not expecting you to know this, but do

4          you know how many training sessions TMS had with

5          Triumph?

6    A.    I don't know at all.  I have no idea.

7    Q.    But it's possible Chuck would know?

8    A.    No, because Chuck is a fairly new employee.

9    Q.    Okay.

10   A.    And the people that ran that before are no longer

11         with the company.

12   Q.    Do you recall their names?

13   A.    No, I don't know who they were.  That was prior to

14         the acquisition.

15   Q.    Okay.  So in these training sessions, in addition to

16         training people in how to use the portal and making

17         sure they are fluent in Total Merchants' products

18         and services, is there any sales training that's

19         provided?

20   A.    No, not in our training sessions, no.

21   Q.    Is there any sales training that's provided in

22         different sessions?

23   A.    Not that I am aware.  Not anything that we offer,

24         that TMS offers.

25                    MR. ZANN:  I am going to object real
```

Page 29

1    Q.    You are on Exhibit 2?

2    A.    Yes.  Yes, it's in there.

3    Q.    Understood.  So there is no other involvement in how

4          SRs sell the product other than what's governed by

5          the contract?

6    A.    Correct.

7    Q.    There is no educational programs or documents

8          related to sales or marketing that's provided to

9          SRs?

10   A.    No, just the agreement that they sign here that

11         talks about how they are supposed to conduct

12         business and what we expect them to do.  Other than

13         that, they are on their own.  We don't see -- we

14         don't talk to them about this once they have signed

15         it.

16   Q.    So there is no oversight over how SRs market the

17         product, other than the contract?

18                   MR. ZANN:  Object to form.  Go ahead and

19         answer.

20                   THE WITNESS:  If they want to do marketing

21         with us, they have to clear it through us first.

22         They have to send us what they want to use for

23         marketing and we would need to okay that for them.

24   BY MR. PELUSO:

25   Q.    Does that include telemarketing?

Page 33

```
1   A.   Yes.  Any type of marketing they would have to clear

2        that through us first, then we would say yes or no.

3   Q.   Do you know if Triumph submitted a request for

4        approval of telemarketing?

5   A.   I have no record of them doing that anywhere.

6   Q.   Did you look for it?

7   A.   No.

8   Q.   Do you know if anyone else has looked for it?

9   A.   I don't know.  I don't know if anyone else has, no.

10  Q.   If an SR did submit a request for permission to

11       telemarket, what sort of criteria would TMS use to

12       determine whether it was going to approve or

13       disapprove the request?

14  A.   I am not aware of exactly what TMS would say is okay

15       or not okay but it would fall back to this section

16       here where does it meet the consumer protection

17       laws.  And then the company they are using, if they

18       are going to use somebody to do the marketing, are

19       they in line with those laws also.

20  Q.   Do you know who would be involved in that evaluation

21       process?  Who would review the applications and

22       investigate whether it would be approved or not

23       approved?

24  A.   At that time, no, I don't.

25  Q.   Well, what about now.  Are you aware of who would be
```

Page 34

1          make sure it has the logo correctly on there and

2          give it a yes or no.  If they ask to do other types

3          of business, like telemarketing and things like

4          that, we always say no to that.

5      Q.  You never approve an SR to do telemarketing?

6      A.  I personally haven't, no.

7      Q.  So does TMS take any steps to ensure that SRs are

8          not doing telemarketing?

9      A.  I mean, we have thousands of sales reps so there is

10         not really a good way to do that, you know.  There

11         is no proactive steps to see what a specific SR is

12         doing on a day-to-day basis, in other words.  What

13         we review is the applications that they send to us

14         and if we can accept them or not.

15     Q.  Got you.

16     A.  We are basically the end point.  They get their own

17         business and then they submit the application to us

18         and we say yes or no through our Underwriting

19         Department.

20     Q.  I got it.  Give me a moment.  I am going to label

21         another exhibit?

22              (Off the record.)

23              MR. ZANN:  I am going to designate the

24         deposition confidential because of the exhibits

25         which we are discussing that have also been

Page 36

Darren McCaffrey - February 25, 2021

```
 1            account rep assigned to that account, it wouldn't
 2            have been too far in the past?
 3   A.   Yes, but they weren't assigned anybody because they
 4            weren't producing any merchant accounts.
 5   Q.   Understood.  Okay.  What was kind of the
 6            threshold -- I know you said InfoFree wasn't made
 7            available to everyone, it was essentially the SRs
 8            that were doing a good job.  Do you know what the
 9            criteria was, how many sales a month or a year would
10            someone have to make to be given access to those
11            leads?
12   A.   I believe at the time it was 50 or more a month.
13   Q.   And when you say at the time, I just want to make
14            sure we are on the same page, what time period are
15            we talking about?
16   A.   When I came into TMS, 2017 until we cut ties with
17            InfoFree.
18   Q.   Last year?
19   A.   Right, 2020.
20   Q.   So it was -- was that 50 a month?  50 a year?
21   A.   Per month.
22   Q.   50 per month, okay.
23                 MR. PELUSO:  I don't think I have anything
24            else for you.  So, Lawren, you can take over.
25                 MR. ZANN:  Give me one moment to gather my
```

Page 75

```
 1            copyright.
 2   A.   Yes.  It's the same one as the other one that we
 3        just looked at.
 4   Q.   When you say it's the same one as the other one, are
 5        you stating that it references Total Merchant
 6        Services, Inc.?
 7   A.   Yes, it references Total Merchant Services, Inc.
 8   Q.   And are you here today providing testimony on behalf
 9        of Total Merchant Services, Inc.?
10   A.   No.
11   Q.   Now, if you can go to Exhibit 3.
12   A.   Okay.
13   Q.   I am going to try to clarify this.  I know we
14        ultimately determined the relationship between the
15        respective parties but I think it's worth maybe a
16        minute to just clarify a few things.
17   A.   Okay.
18   Q.   Go to Exhibit 3.
19   A.   I'm there.
20   Q.   Now, do you recall discussing this document with
21        Mr. Peluso earlier in today's deposition?
22   A.   Yes.
23   Q.   And in the course of that discussion, I believe you
24        indicated that this document should also contain
25        Total Merchant Supplies; is that correct?
```

Page 78

Darren McCaffrey - February 25, 2021

```
1    A.   That's correct.

2    Q.   And why did you say that?

3    A.   Because this document references the document that's

4         dated January 15, 2014, which in that sales rep's

5         name d/b/a is Total Merchant Supplies.

6    Q.   And if we go down to section 1 (a).

7    A.   Yes.

8    Q.   And you read that first line, do you see that

9         references two agent profile numbers?

10   A.   Yes.

11   Q.   Is one of those agent profile numbers Triumph?

12   A.   Yes.

13   Q.   And which one is Triumph?

14   A.   44884.

15   Q.   And are you aware of which agent number is 38566?

16   A.   Yes.  That's Total Merchant Supplies'.

17   Q.   With that understanding, is it TMS's testimony that

18        this addendum amends the agreement between both

19        Total Merchant Supplies and TMS on the one hand, and

20        Triumph and TMS on the other hand?

21   A.   Yes, that's what it's referring to.

22   Q.   And there was also discussion about whether Triumph

23        has its own stand-alone sales rep agreements.  Do

24        you recall that testimony?

25   A.   Yes.
```

Page 79

1    Q.    Are you aware of Triumph having a sales rep

2          agreement separate and apart from the January 15,

3          2014 agreement?

4    A.    I am not.

5    Q.    And is it TMS's testimony that Triumph, through this

6          Exhibit 3 special compensation addendum we are

7          looking at now, adopted and incorporated the terms

8          of that January 15, 2014, sales rep agreement?

9    A.    Yes.

10   Q.    Thank you.  I just wanted to clarify the

11         relationship between the parties.  You also earlier

12         testified that TMS does not have any involvement in

13         Triumph's sales.  Do you recall that testimony?

14   A.    Yes.

15   Q.    And I believe you followed that up with except as

16         reflected in the sales rep agreement.  Do you recall

17         that?

18   A.    Correct, yes.

19   Q.    And part of that you referenced was there being

20         Triumph's obligation to adhere to all laws including

21         consumer protection laws.  Do you recall that?

22   A.    Yes.

23   Q.    In addition to that section of the agreement, would

24         TMS also have involvement in Triumph's sales to the

25         extent that TMS required Triumph to submit marketing

                                              Page 80

1           materials for approval prior to using those

2           marketing materials?

3    A.    Yes.

4    Q.    And based on your review of TMS's documents, have

5           you seen any requests from Triumph to use any

6           marketing materials?

7    A.    No.

8    Q.    And when referring to any marketing materials, I am

9           going to make it a little more specific, how about

10          as it relates to telemarketing scripts?

11   A.    No.

12   Q.    Now, when you also talked about TMS's approach to

13          compliance with consumer protection laws, you

14          indicated that that's reflected in the sales rep

15          agreement.  Do you recall that testimony?

16   A.    Yes.

17   Q.    In addition -- well, strike that.  If Triumph were

18          to have provided you with a telemarketing script,

19          would you have conferred with your in-house counsel

20          concerning how you would approach the approval of

21          such marketing platform?

22   A.    Yes.

23   Q.    But in this instance, you did not confer with your

24          in-house counsel because such script was never

25          submitted to TMS?

                                              Page 81

1    A.    That's correct.

2    Q.    As far as you are aware, beyond this one Exhibit 3,

3          Special Compensation Addendum, was the Triumph sales

4          rep agreement ever modified?

5    A.    No, not that I am aware of.

6    Q.    So it's TMS's testimony that the January 15, 2014

7          agreement, as modified by this Exhibit 3 Special

8          Compensation Addendum, is the terms and conditions

9          of the relationship between TMS and Triumph?

10   A.    Yes.

11   Q.    Now, pivoting towards Mr. Judy, I am going to ask a

12         similar set of questions.

13   A.    Okay.

14   Q.    Are you aware of Mr. Judy's Sales Representation

15         Agreement having been amended or otherwise modified?

16   A.    No.

17   Q.    So similar to what you have just testified to as it

18         relates to Triumph, for Mr. Judy, is it a fair

19         statement that the terms and conditions of the

20         relationship between TMS and Mr. Judy are as

21         reflected in that Sales Representation Agreement?

22   A.    Yes.

23   Q.    And I know there was a lot of discussion about the

24         use of TMS's name and logo on certain documents that

25         Mr. Judy appears to have used.  Do you recall that

Page 82

1         line of testimony?

2   A.    Yes.

3   Q.    To the extent Mr. Judy was permitted to use TMS's

4         name or logo, is it TMS's position that that

5         authority would be reflected in the Sales

6         Representation Agreement between Mr. Judy and TMS?

7   A.    Yes, it would be in there.

8   Q.    So really what I am getting at is outside of that

9         Sales Representation Agreement between Mr. Judy and

10        TMS, there are no other written agreements you are

11        aware of that set forth the rights and obligations

12        between the respective parties?

13  A.    No.

14  Q.    Now how about you pull up Exhibit 12 for me real

15        quick.

16  A.    It's loading.  I have it up.

17  Q.    I believe you testified earlier that you are not

18        familiar with this document; is that correct?

19  A.    Correct.

20  Q.    And this is not a document TMS provides to any third

21        parties; is that correct?

22  A.    Correct.

23  Q.    Now, looking at the first page, kind of right in the

24        middle of the page, you will see a red arrow that

25        says this is 100 percent free.  Do you see that?

                                                   Page 83

1   A.    I do.

2   Q.    And if you go down a little bit more, you will see

3          in red there is what appears to be a portion of a

4          URL.  Do you see that?

5   A.    I do.

6   Q.    And that URL reads www.americanmerchants.co; is that

7          correct?

8   A.    Yes.

9   Q.    Is www.americanmerchants.co TMS's website?

10   A.    No.

11   Q.    Now, just to kind of clean up the testimony as it

12          relates to InfoFree.  You had mentioned that only

13          certain sales reps would be put in contact with

14          InfoFree; is that correct?

15   A.    Yes.

16   Q.    And you had stated that that's based upon the

17          production of those sales reps; is that right?

18   A.    Yes.

19   Q.    And I believe you said you think it might have been

20          50 merchant application submissions per month which

21          would lead to the provision of InfoFree's

22          information; is that right?

23   A.    Yes; it was significant.

24   Q.    So based on that testimony, as you sit here today,

25          knowing that Triumph did not submit a single

Page 84

1           merchant application to TMS, is it TMS's belief that

2           it did not provide InfoFree's information to

3           Triumph?

4    A.     Yes, that's our belief.

5    Q.     And pivoting to the policies and procedures of TMS

6           as it relates to compliance with the TCPA or other

7           consumer protection laws.  Kind of going back to

8           what you and I discussed maybe two or three minutes

9           ago, in addition to the agreement to adhere to all

10          laws, the SRA requires Triumph to submit any

11          marketing materials to TMS for approval; is that

12          right?

13   A.     That's correct.

14   Q.     And similarly, it required the same of Mr. Judy; is

15          that correct?

16   A.     Yes, that's correct.

17   Q.     And you testified earlier that had Triumph submitted

18          a telemarketing script, you would have conferred

19          further with in-house counsel concerning whether or

20          not to approve the use of such script; is that

21          right?

22   A.     Yes.

23   Q.     In addition to the conferral as to whether or not

24          you would have approved the use of such script,

25          would you investigate further in terms of the manner

                                                     Page 85

```
 1            in which telephone calls were being placed by
 2            Triumph in this instance?
 3    A.      I'm sorry.  Could you repeat that?
 4    Q.      Sure.  You had indicated that you would confer with
 5            your in-house counsel to determine if you would
 6            approve the telemarketing script; is that right?
 7    A.      Yes, that's correct.
 8    Q.      But kind of taking it one step further, in addition
 9            to conferring to determine if you are going to
10            approve the use of the script, would you also follow
11            up with Triumph to investigate further concerning
12            the platform in which they are placing telephone
13            calls -- in which they are using to place the
14            telephone calls?
15    A.      Yes, we would want to know that.
16    Q.      But in this case, that did not happen with Triumph;
17            is that correct?
18    A.      That's correct.
19    Q.      And that did not happen because Triumph never sought
20            TMS's approval to use telemarketing scripts; is that
21            correct?
22    A.      Right, they didn't send us anything.
23    Q.      And in an attempt to be efficient here, does the
24            same hold true with Mr. Judy?
25    A.      Yes, the same situation.
```

# EXHIBIT D

```
 1                          UNITED STATES DISTRICT COURT
 2                        NORTHERN DISTRICT OF CALIFORNIA
 3                            _____
 4        ABANTE ROOTER AND PLUMBING,  )
          INC., a California           )
 5        corporation, individually    )
          and on behalf of all others  )
 6        similarly situated,          )No. 3:19-CV-05711
                                        )
 7                     Plaintiff,       )
                                        )
 8              vs.                     )
                                        )
 9        TOTAL MERCHANT SERVICES,      )
          LLC, a Delaware limited       )
10        liability company,           )
                                        )
11                     Defendant.       )
                                        )
12
13
14                    REMOTE VIDEOTAPED DEPOSITION
15                               OF
16                       FRED HEIDARPOUR
17                    Wednesday, March 3rd, 2021
18                       Orinda, California
19
20
21
22
23
24
25        Reported by:  Janie E. Wilkins, CSR No. 12497

                                                 Page 1
```

```
 1                         APPEARANCES
 2
 3
 4
 5      For Plaintiff:        Woodrow & Peluso, LLC
                              BY MR. TAYLOR SMITH
 6                            Attorney at Law
                              3900 East Mexico Avenue
 7                            Suite 300
                              Denver, Colorado 80210
 8                            (720) 213-0675
                              tsmith@woodrowpeluso.com
 9
10
11      For Defendant Total   Greenspoon Marder, LLP
        Merchant Services:    BY MR. LAWREN A. ZANN
12                            Attorney at Law
                              200 East Broward Boulevard
13                            Site 1800
                              Fort Lauderdale, Florida 33301
14                            (954) 527-2427
                              lawren.zann@gmlaw.com
15
16
17
18
19
20      The Videographer:     Terri Perkins
21
22
23
24
25
                                            Page  2
```

```
 1                    I   N   D   E   X

 2

 3    EXAMINATION BY                               PAGE

 4    MR. ZANN                                        6

 5    MR. SMITH                                     288

 6    MR. ZANN (Further)                            290

 7

 8

 9                    EXHIBIT INDEX

10    Defendant's Exhibits

11    Exhibit 1    Notice of Deposition             33

12    Exhibit 2    Complaint                        72

13    Exhibit 3    E-mails from Aleks Meza          94

14    Exhibit 4    E-mail from Leutrim Ismajli      96

15    Exhibit 5    E-mail Communication             99

16    Exhibit 6    Plaintiff's Objection and Response  116
                   to Defendant's Interrogatories

17

      Exhibit 7    Plaintiff's Supplemental Objection  118

18                 and Responses to Defendant's
                   Interrogatories

19

      Exhibit 8    Plaintiff's Second Supplemental     120

20                 Objections and Responses

21    Exhibit 9    Printout of Website              194

22    Exhibit 10   Phone bill for 10/20/18          229

23    Exhibit 11   Phone bill for 4/19/19           229

24    Exhibit 12   Document entitled AT&T Your      229
                   detailed usage

25

                                              Page  3
```

1

                    I   N   D   E   X  (Continued)

2

3

                         EXHIBIT INDEX

4     Defendant's Exhibits

5     Exhibit 13   Document with AT&T Cycle Date      229
                   of 10/20/18

6

      Exhibit 14   Retainer Agreement                 277

7

8

9

10

11

12

13    WITNESS INSTRUCTED NOT TO ANSWER:

14                                    Page 26, Line 3

15

16

17

18

19

20

21

22

23

24

25

                                                Page 4

Fred Heidarpour - March 3, 2021

```
 1        Q.   Okay.  So are you aware of the telephone      09:55:51

 2   numbers that received the alleged calls at issue in     09:55:55

 3   this litigation?                                        09:56:00

 4        A.   Yes, that's the number that we went over it   09:56:02

 5   yesterday.  Yes.                                        09:56:06

 6        Q.   Okay.  And they're actually three different   09:56:07

 7   numbers; correct?                                       09:56:10

 8        A.   Yes.                                           09:56:11

 9        Q.   Do you recall what those three numbers are?   09:56:13

10        A.   Yes.                                           09:56:16

11        Q.   Okay.  And what were those three numbers?     09:56:17

12        A.   (925) 828-1080, (209) 383-3803,               09:56:19

13   (510) 534-1636.                                          09:56:32

14        Q.   Now, just so we can use the same term going   09:56:35

15   forward, because I'm not a numbers guy.  If I refer     09:56:39

16   to the number ending in -3803 or the -3803 number,     09:56:42

17   will you understand I'm referring to the                09:56:46

18   (209) 383-3803 number you just testified to?            09:56:48

19        A.   Yes.                                           09:56:53

20        Q.   And, similarly, if I refer to a number as     09:56:54

21   the number ending in -1080 or the -1080 number, will   09:56:57

22   you understand I'm referring to the                     09:57:03

23   telephone number (925) 828-1080 you just testified     09:57:04

24   to?                                                      09:57:10

25        A.   Yes.                                           09:57:10
```

Page 49

Fred Heidarpour - March 3, 2021

```
 1   in 2010, 2012; right?  At the time I had the cell        10:04:17

 2   phone for it -- when I had a cell phone for it, then     10:04:22

 3   we forward it to my number.                              10:04:27

 4         All of those numbers that I said if you go         10:04:32

 5   through my AT&T bill, you're going to see I have         10:04:35

 6   about -- many numbers, 15, 18 numbers, whatever.  At     10:04:40

 7   the time, we had it, but all of them right now           10:04:46

 8   comes to (510) 385-7447.                                 10:04:48

 9         If I want to go in and deforward it, that          10:04:52

10   means I have to go and find the phone that I got at      10:04:57

11   the time of -- that I got.  Then I'm -- I can answer     10:05:00

12   on that cell phone.  But practically all of them come    10:05:03

13   to my (510) 385-7447.                                    10:05:07

14      Q.  All right.  I understand.  So my question to      10:05:10

15   you is the telephone calls that you've alleged in        10:05:14

16   this litigation -- which I will represent to you         10:05:17

17   occurred in -- from July 2018 forward, are you aware     10:05:20

18   of that?                                                 10:05:27

19      A.  Yes.                                              10:05:27

20      Q.  Those calls that you've alleged in this           10:05:29

21   litigation, are you aware that you've alleged they       10:05:31

22   were received on the numbers ending in -3803, -1080,     10:05:35

23   and -1636?                                               10:05:39

24      A.  Yes.                                              10:05:41

25      Q.  And your testimony today is that the calls        10:05:42
```

Page 55

Fred Heidarpour - March 3, 2021

| | | |
|---|---|---|
| 1 | received on the numbers ending in -3803, -1080, | 10:05:46 |
| 2 | and -1636, are -- are forwarded to your | 10:05:51 |
| 3 | (510) 385-7447 telephone; is that correct? | 10:05:57 |
| 4 | A.  Yes. | 10:06:01 |
| 5 | Q.  So at the time in 2018, in 2019 when these | 10:06:03 |
| 6 | alleged calls occurred, is it a fair statement that | 10:06:07 |
| 7 | the calls to the number ending in -3803 forwarded to | 10:06:10 |
| 8 | your telephone (510) 385-7447? | 10:06:16 |
| 9 | A.  Correct. | 10:06:20 |
| 10 | Q.  And you've stated that if you wanted to take | 10:06:21 |
| 11 | the number ending -3803 off of call forwarding, you | 10:06:25 |
| 12 | would have to go find the physical telephone | 10:06:29 |
| 13 | associated with the number -3803; is that correct? | 10:06:33 |
| 14 | A.  Correct. | 10:06:36 |
| 15 | Q.  So if you took it off call forwarding and | 10:06:38 |
| 16 | went to find that physical phone, where would you | 10:06:41 |
| 17 | look for that physical phone associated with the | 10:06:46 |
| 18 | number -3803? | 10:06:49 |
| 19 | MR. SMITH:  Objection -- | 10:06:50 |
| 20 | THE WITNESS:  I'd have to go and find -- I | 10:06:51 |
| 21 | have boxes of the phones. | 10:06:54 |
| 22 | BY MR. ZANN: | |
| 23 | Q.  Do you know where those boxes are? | 10:06:56 |
| 24 | A.  They're in Scottsdale. | 10:06:58 |
| 25 | Q.  They're in Scottsdale.  Okay. | 10:07:00 |

Page 56

1      A.  Yes.                                          10:07:01

2      Q.  And the box in Scottsdale, is that also      10:07:02

3   associated with the number ending in -1080?          10:07:04

4      A.  No, -1080 was the -- was the old -- I        10:07:12

5   believe, it's a 30-year-old number that was forwarded 10:07:18

6   to my cell phone that; they changed it from landline  10:07:22

7   to cell line and then they tried to forward it.       10:07:26

8      Q.  Okay.  So is there not a cellular telephone   10:07:29

9   associated with the number ending in -1080, if you   10:07:34

10   took it off the forward number?                      10:07:38

11      A.  Right.  This is a cell number.  Yes.         10:07:40

12      Q.  Right.  So is it a fair statement that if    10:07:43

13   you were not forwarding the number ending -1080, you 10:07:45

14   would not have a cellular telephone in which to      10:07:49

15   answer calls placed to that number?                  10:07:52

16      A.  Right.                                        10:07:54

17      Q.  And as it relates to the number ending       10:07:56

18   in -1636, would you also search the box in Scottsdale 10:07:59

19   for the physical phone associated with the number    10:08:04

20   ending in -1636?                                      10:08:06

21      A.  No, that is a number -- that is a number     10:08:09

22   from 1992 that was for Abante Plumbing, and back in  10:08:12

23   early 2000 converted to a cellular number.           10:08:20

24      Q.  So similar to the number ending in -1080, if 10:08:24

25   you were not forwarding the number ending in -1636,  10:08:28

Page 57

Fred Heidarpour - March 3, 2021

| | | |
|---|---|---|
| 1 | Q.  Currently if a number came through to the -- | 10:14:48 |
| 2 | to the telephone number ending in -1080, it would | 10:14:53 |
| 3 | forward to (510) 385-7447; is that correct? | 10:14:56 |
| 4 | A.  Yes. | 10:15:01 |
| 5 | Q.  So my question to you is -- it's rather | 10:15:02 |
| 6 | simple.  If call forwarding was turned off for the | 10:15:05 |
| 7 | number ending in -1080, is there a telephone that | 10:15:10 |
| 8 | would receive a call placed to the number ending | 10:15:14 |
| 9 | in -1080? | 10:15:17 |
| 10 | MR. SMITH:  Objection; calls for | 10:15:19 |
| 11 | speculation; asked and answered. | 10:15:20 |
| 12 | BY MR. ZANN: | 10:15:25 |
| 13 | Q.  You can answer. | 10:15:26 |
| 14 | A.  I'm sorry, say it one more time. | 10:15:28 |
| 15 | Q.  Yeah.  Currently if you turned | 10:15:30 |
| 16 | call forwarding off to the number ending in -1080 and | 10:15:32 |
| 17 | a call is placed to the number ending in -1080, is | 10:15:36 |
| 18 | there a telephone that would receive the call? | 10:15:41 |
| 19 | MR. SMITH:  Same objections. | 10:15:46 |
| 20 | THE WITNESS:  No. | 10:15:47 |
| 21 | BY MR. ZANN: | 10:15:48 |
| 22 | Q.  Okay.  And just as a point of comparison, we | 10:15:48 |
| 23 | have established through your testimony that as it | 10:15:55 |
| 24 | relates to the number ending -3803, there is a | 10:15:58 |
| 25 | telephone that would receive a call to -3803, that | 10:16:03 |

Page 63

Fred Heidarpour - March 3, 2021

```
 1    trying to trick you, based on the one possible cell      10:23:08
 2    phone your son may have, the two you have, and the       10:23:11
 3    one that James has, Aldo has, and Moses?                 10:23:15
 4        A.  Yeah.                                            10:23:20
 5        Q.  Yeah, I just do math and I count six; is         10:23:20
 6    that right?                                              10:23:23
 7        A.  Yeah.                                            10:23:24
 8        Q.  Okay.  I want to make sure I'm                   10:23:25
 9    understanding.                                           10:23:26
10           Okay.  Without looking at the complaint --       10:23:27
11    and this isn't a trap here.  I just want to know if I    10:23:37
12    should pull up the complaint on Exhibit Share.           10:23:41
13           Are you aware of the dates you've alleged to      10:23:43
14    have received the cellular telephone calls at issue?     10:23:45
15        A.  In general, yes.                                 10:23:50
16        Q.  Okay.  And what are those dates that you         10:23:52
17    received telephone calls you alleged to be in            10:23:55
18    violation of the TCPA in this lawsuit?                   10:23:59
19        A.  Starting in 2015.                                10:24:00
20        Q.  Okay.  Do you remember a specific date?          10:24:04
21        A.  No.                                              10:24:06
22        Q.  And that's why I had asked you.  I'm not         10:24:08
23    trying to trap you.  If we need to go through the        10:24:10
24    complaints or your discovery responses, we can do        10:24:12
25    that if you need that to refresh your recollection.      10:24:15
```

Page 70

```
 1        A.   Definitely.  There is no way that I can        10:24:18

 2   remember.                                                10:24:20

 3             Lawren, just for your information, on the      10:24:20

 4   average -- on the average, I get 10 to 20 calls a day    10:24:23

 5   from telemarketers.                                      10:24:28

 6        Q.   Okay.  And are those 10 to 20 telephone        10:24:29

 7   calls -- is it your testimony those 10 to 20            10:24:32

 8   telephone calls are associated with TMS?                10:24:35

 9        A.   No.  I'm just talking about in general.        10:24:39

10   When you asked me that if you need to refresh my         10:24:41

11   recollection, I'm saying that I'm getting that many      10:24:45

12   calls every day.                                         10:24:48

13        Q.   And as it relates to your receipt of 10        10:24:50

14   to 20 telephone calls to your cellular telephones,       10:24:54

15   have you filed any lawsuits against the entities who     10:24:57

16   have placed those calls?                                 10:25:00

17        A.   I -- I try to do my best.  That is the only    10:25:02

18   way that we can stop them.                               10:25:05

19        Q.   Now, kind of going back to where this line     10:25:06

20   of questioning started.  I'm going to go ahead and       10:25:11

21   pull up the complaint on Exhibit Share because if I      10:25:14

22   say a date, you seem to indicate you won't know          10:25:18

23   unless you look at a document; is that fair?             10:25:20

24        A.   Yes.                                           10:25:23

25        Q.   Okay.  So give me one second.                  10:25:23
```

Page 71

Fred Heidarpour - March 3, 2021

| | | |
|---|---|---|
| 1 | A.   I'm not 100 percent sure, but it looked like | 10:32:20 |
| 2 | it, yes. | 10:32:23 |
| 3 | Q.   Okay.  What occurred on that call that makes | 10:32:23 |
| 4 | you believe TMS called you directly on | 10:32:29 |
| 5 | March 22nd, 2019? | 10:32:32 |
| 6 | A.   That's -- as I said, I don't -- I don't | 10:32:34 |
| 7 | recall now, but if I -- if I remember it right, then | 10:32:38 |
| 8 | I press it, then I talk to the person that -- that | 10:32:41 |
| 9 | person was talking about the T- -- I'm not 100 | 10:32:44 |
| 10 | percent sure.  I don't know.  I don't remember.  That | 10:32:47 |
| 11 | was obviously -- it was two years ago. | 10:32:50 |
| 12 | Q.   Okay.  Did you take notes from that call? | 10:32:52 |
| 13 | A.   Usually what I do is -- because I have a | 10:32:56 |
| 14 | daily call that basically I throw it away every 30 | 10:33:02 |
| 15 | days.  If I get a call or something like that, I just | 10:33:06 |
| 16 | jot on it.  And then I'm -- then after I jot on it, | 10:33:09 |
| 17 | I -- basically after 30 days I throw it away. | 10:33:12 |
| 18 | Usually that -- that is my daily call; that every | 10:33:15 |
| 19 | call that I get, I write it down. | 10:33:18 |
| 20 | Q.   Okay.  And you say usually you engage in | 10:33:19 |
| 21 | that practice; correct? | 10:33:23 |
| 22 | A.   Yes. | 10:33:25 |
| 23 | Q.   Did you engage in that practice on | 10:33:26 |
| 24 | March 22nd, 2019? | 10:33:28 |
| 25 | A.   To my best recollection, yes. | 10:33:31 |

Page 76

Fred Heidarpour - March 3, 2021

```
1        Q.   So where would those notes be now?          10:33:34
2        A.   Oh, it's gone.  Those notes are for --       10:33:39
3    temporary until -- until I basically provide it to my  10:33:42
4    attorney or whatever.  I write it down.  After that,    10:33:45
5    I throw it away.                                        10:33:47
6        Q.   When you say you write it down, are these     10:33:49
7    notes taken in a digital medium?                        10:33:51
8        A.   No, no, no.  This is -- it's old-fashioned.    10:33:55
9        Q.   Okay.  So you handwrite the notes?            10:33:59
10       A.   Handwrite the notes, yes.                      10:34:01
11       Q.   So to the extent you took notes on            10:34:03
12   March 22nd, 2019, those notes would have been           10:34:05
13   handwritten; is that correct?                           10:34:08
14       A.   Yes.                                           10:34:10
15       Q.   And if you took those handwritten notes, I    10:34:11
16   believe you indicated you provide them to your          10:34:13
17   attorney?                                               10:34:17
18       A.   Not -- not the notes.  I just -- I just make  10:34:17
19   it for myself.  Then I tell my attorney, "I just        10:34:21
20   received a call, and it was a prerecorded call or the   10:34:25
21   ATDS."  That's what I tell them.                        10:34:28
22       Q.   Okay.                                          10:34:31
23       A.   That's the extent of my note.                 10:34:32
24       Q.   Sure.  That's your usual practice here.  But  10:34:35
25   as it relates to this March 22nd, 2019, call, do you    10:34:37
```

Page 77

Fred Heidarpour - March 3, 2021

| | | |
|---|---|---|
| 1 | we discussed your usual practice of taking notes; | 10:40:20 |
| 2 | correct? | 10:40:23 |
| 3 | A.  Yes. | 10:40:24 |
| 4 | Q.  Those notes are handwritten notes; correct? | 10:40:25 |
| 5 | A.  Yes. | 10:40:28 |
| 6 | Q.  And I asked you if you still have those | 10:40:28 |
| 7 | notes, and you indicated you do not; correct? | 10:40:32 |
| 8 | A.  Yes. | 10:40:35 |
| 9 | Q.  And your practice is to throw your | 10:40:36 |
| 10 | handwritten notes away after you've communicated to | 10:40:37 |
| 11 | your attorney; correct? | 10:40:41 |
| 12 | A.  Yeah, but, see, the part that I believe you | 10:40:43 |
| 13 | don't understand what I'm saying is is it's not just | 10:40:48 |
| 14 | a note for the telemarketers.  It's the other notes | 10:40:51 |
| 15 | too. | 10:40:57 |
| 16 | But what I'm saying is is, yes, I do not | 10:40:58 |
| 17 | keep any notes that -- this thing or something like | 10:41:01 |
| 18 | that.  I throw it away.  There is no reason to keep | 10:41:04 |
| 19 | it after I provide it to my attorney. | 10:41:07 |
| 20 | Q.  Now, when you say the "other notes too," | 10:41:08 |
| 21 | what are those other notes you're referencing? | 10:41:11 |
| 22 | A.  Communication that I have with an employee | 10:41:14 |
| 23 | in case -- for example, the customer wants to do | 10:41:17 |
| 24 | something, I just write it down.  You know what I'm | 10:41:19 |
| 25 | saying?  It's not something that is just for a | 10:41:21 |

Page 83

Fred Heidarpour - March 3, 2021

```
 1    telemarketer, no.                                      10:41:25

 2         Q.  So when you're referring to communications   10:41:26

 3    with a customer, you're referring to Abante's         10:41:29

 4    customers; correct?                                   10:41:32

 5         A.  Yes.                                          10:41:34

 6         Q.  But those notes you also throw away?          10:41:34

 7         A.  Yeah.  If the customer, for example, called  10:41:37

 8    me and said something about the concern he has or if  10:41:39

 9    he wants to do something, I just make a note and then 10:41:42

10    after the job is done, I throw it away.               10:41:45

11         Q.  Understood, understood.                       10:41:48

12             But now coming back to the March 22nd, 2019  10:41:49

13    telephone call that you've alleged in your complaint, 10:41:52

14    are you aware of providing your notes to any          10:41:55

15    attorney?                                             10:41:59

16         A.  No, I just called them and told them that.   10:42:00

17         Q.  So your testimony is that you did not        10:42:03

18    provide the notes that you took to any attorney; but, 10:42:05

19    rather, you communicated whatever was on those notes  10:42:08

20    to an attorney?                                       10:42:11

21         A.  Yes.                                          10:42:13

22         Q.  Who was the attorney you communicated        10:42:14

23    your -- the substance of your notes to?               10:42:17

24         A.  At the time what -- probably was Pat.        10:42:22

25         Q.  Now, you say "probably."  Are you guessing,  10:42:27
```

Page 84

| | | |
|---|---|---|
| 1 | or do you know this? | 10:42:29 |
| 2 | A.  No, because I'm not 100 percent sure who | 10:42:30 |
| 3 | did -- I was talking to.  Most likely it was Pat. | 10:42:34 |
| 4 | Q.  Are you 100 percent sure that you even had a | 10:42:39 |
| 5 | conversation with an attorney based on your notes | 10:42:44 |
| 6 | that you took? | 10:42:46 |
| 7 | A.  Yes. | 10:42:48 |
| 8 | MR. SMITH:  I've got to use the restroom. | 10:42:51 |
| 9 | MR. ZANN:  Yeah, absolutely.  We'll take a | 10:42:55 |
| 10 | break. | 10:42:57 |
| 11 | THE WITNESS:  We're going to break? | 10:43:00 |
| 12 | THE VIDEOGRAPHER:  We are off the record. | 10:43:03 |
| 13 | The time is 10:43 a.m. | 10:43:05 |
| 14 | (Recess taken.) | 10:43:12 |
| 15 | THE VIDEOGRAPHER:  We are back on the | 10:50:25 |
| 16 | record.  The time is 10:51 a.m. | 10:50:39 |
| 17 | MR. SMITH:  Lawren, can you give me two | 10:50:42 |
| 18 | minutes? | 10:50:46 |
| 19 | MR. ZANN:  Going back off. | 10:50:46 |
| 20 | THE VIDEOGRAPHER:  We are off the record. | 10:50:47 |
| 21 | The time is 10:51 a.m. | 10:50:50 |
| 22 | (Recess taken.) | 10:50:55 |
| 23 | THE VIDEOGRAPHER:  We are back on the | 10:52:35 |
| 24 | record.  The time is 10:53 a.m. | 10:52:47 |
| 25 | /// | |

Page 85

Fred Heidarpour - March 3, 2021

```
 1    would you agree with that?                          10:55:29

 2        A.  Yes.                                         10:55:30

 3        Q.  And you see when reading that allegation, it 10:55:31

 4    states in the last sentence, "This call made using a 10:55:35

 5    prerecorded voice message; correct?                  10:55:38

 6        A.  Right.                                        10:55:41

 7        Q.  Is that why you believe the March 22nd,       10:55:41

 8    2019, call was a prerecorded call because it's        10:55:44

 9    specifically alleged in the complaint?                10:55:48

10        MR. SMITH:  Objection; mischaracterizes the       10:55:49

11    witness' prior testimony.                             10:55:52

12    BY MR. ZANN:                                          10:55:54

13        Q.  Go ahead.                                     10:55:57

14        A.  No, as I said earlier, I made a note that     10:55:57

15    was in the middle of the call.                        10:56:00

16        Q.  I understand that.  If you had not read this  10:56:02

17    complaint to refresh your recollection, would you     10:56:05

18    have been able to testify today that you received a   10:56:09

19    call on March 22nd, 2019, that you believe was a      10:56:12

20    prerecorded voice message?                            10:56:15

21        MR. SMITH:  Objection; calls for                  10:56:17

22    speculation.                                          10:56:21

23        THE WITNESS:  I don't know.  Maybe.               10:56:21

24    BY MR. ZANN:                                          10:56:23

25        Q.  Do you have any independent recollection of   10:56:23
```

Page 88

```
 1   what occurred on the telephone call that happened on    10:56:26

 2   March 22nd, 2019?                                        10:56:29

 3       A.  No.                                              10:56:34

 4       Q.  Do you recall what -- I'm sorry, go ahead.       10:56:36

 5       A.  What do you mean by -- as I -- as what is        10:56:38

 6   alleged here, that on the date that was a prerecorded    10:56:41

 7   call, and that was the date that I remember that was     10:56:47

 8   prerecorded because that's as I said in the             10:56:51

 9   complaint.                                               10:56:54

10       Q.  I understand that at the time this complaint     10:56:56

11   was filed you remembered it; but as you sit here         10:56:58

12   today, do you remember the call that occurred on         10:57:01

13   March 22nd, 2019?                                        10:57:03

14       A.  To my best recollection, that was a             10:57:06

15   prerecorded call, and it says if you want to do A, B,    10:57:08

16   C, D, press whatever number, and then I did, and then    10:57:11

17   I talked to someone.  That's -- that's the reason why    10:57:14

18   I said it was a prerecorded voice message.               10:57:17

19       Q.  So let's break that down a little further.       10:57:19

20           What did the prerecorded voice message say?      10:57:22

21       A.  Again, it says if you want to go and save        10:57:25

22   some money on your processing -- on your credit card     10:57:27

23   processing, dial 1 or 2, or whatever it was.             10:57:31

24       Q.  And in the course of that prerecorded            10:57:34

25   message, did it reference TMS?                           10:57:37
```

Page 89

Fred Heidarpour - March 3, 2021

```
 1   the substance of their call.                      11:18:03

 2       Q.  Okay.  And are there any documents you rely  11:18:06

 3   upon to provide that testimony besides the actual   11:18:10

 4   complaints you just reviewed?                       11:18:14

 5           MR. SMITH:  Objection -- (Zoom              11:18:16

 6   interference).                                      11:18:22

 7   BY MR. ZANN:                                        11:18:22

 8       Q.  You can answer.                             11:18:22

 9       A.  If I would have it, I would provide it.  My  11:18:23

10   counsel would have it.                              11:18:25

11       Q.  Do you know if you have it?                 11:18:26

12       A.  I don't recall because, as you can see, we  11:18:28

13   are receiving so many calls and so many e-mails, I  11:18:31

14   don't recall one by one.                            11:18:34

15       Q.  So because you don't recall even if you have  11:18:36

16   that e-mail, does it also follow that you don't know  11:18:38

17   if such an e-mail even exists in the first instance?  11:18:42

18           MR. SMITH:  Objection; argumentative.      11:18:46

19           THE WITNESS:  Sir, as I said, I received so  11:18:48

20   many calls from them and so many e-mails from them,  11:18:51

21   how is it possible that I can tell you three years   11:18:55

22   ago, two years ago what did I receive and what did I  11:18:58

23   not receive?                                        11:19:01

24           All I can tell you is that the complaint    11:19:02

25   that reflects -- the accurate of my memory at the   11:19:05
```

Page 105

```
 1    time, that I gave it to my attorneys.              11:19:09

 2    BY MR. ZANN:                                       11:19:11

 3        Q.  Are you aware of having received any e-mails  11:19:11

 4    following the March 22nd, 2019, call you've alleged  11:19:14

 5    took place with a rerecorded voice message?        11:19:18

 6            MR. SMITH:  Objection; asked and answered.  11:19:20

 7            THE WITNESS:  I would have to look at it and  11:19:23

 8    see.                                               11:19:25

 9    BY MR. ZANN:                                       11:19:26

10        Q.  And when you say "look at it," what is the  11:19:26

11    "it" that you would look at?                       11:19:29

12        A.  The e-mail that was provided to TMS -- the  11:19:32

13    documents that were provided to TMS.               11:19:35

14        Q.  Now, you say "the documents that were      11:19:37

15    provided to TMS," but what I'm asking you -- strike  11:19:38

16    that.                                              11:19:41

17            Following the e-mail which may have -- you  11:19:43

18    may have received following your March 22nd, 2019,  11:19:46

19    call you alleged to have placed by a prerecorded   11:19:49

20    voice message, is it your testimony that TMS was   11:19:52

21    either the sender or a recipient of that e-mail?   11:19:57

22        A.  I'm sorry, ask me one more time.           11:20:03

23        Q.  Sure.  March 22nd, 2019, you've alleged you  11:20:05

24    received a telephone call using a prerecorded voice  11:20:10

25    message; correct?                                  11:20:13
```

Veritext Legal Solutions
303-988-8470

| 1 | being November 5th, 2018 -- you may have to actually | 11:51:18 |
| 2 | scroll to the Second Supplemental Response to answer | 11:51:27 |
| 3 | this.  But I'll ask the question nonetheless. | 11:51:30 |
| 4 | Was that telephone call allegedly placed to | 11:51:33 |
| 5 | the -3803 telephone number? | 11:51:38 |
| 6 | A.  I'm sorry, what is the date?  November 5th? | 11:51:42 |
| 7 | Q.  Yes. | 11:51:45 |
| 8 | A.  Yes. | 11:51:46 |
| 9 | Q.  First in time to most recent. | 11:51:47 |
| 10 | A.  Yes. | 11:51:49 |
| 11 | Q.  Do you recall the contents of that telephone | 11:51:53 |
| 12 | call? | 11:51:56 |
| 13 | A.  No, just as I said, the -- the substance of | 11:51:59 |
| 14 | the call that I remember that was selling the | 11:52:06 |
| 15 | products.  I do not know verbiage, verbatim, what did | 11:52:09 |
| 16 | they say, what did he say, whatever, I don't -- I | 11:52:14 |
| 17 | don't recall that.  The substance of it was to sell | 11:52:16 |
| 18 | the TMS product.  That's what it was. | 11:52:18 |
| 19 | Q.  Do you recall the identity of the individual | 11:52:21 |
| 20 | with whom you spoke on the November 5th, 2018, call? | 11:52:25 |
| 21 | A.  I'd have to go back to the -- if I -- if I | 11:52:29 |
| 22 | requested -- most of the time I would request the | 11:52:32 |
| 23 | e-mail.  If I received the e-mail, then I can see who | 11:52:35 |
| 24 | was the individual. | 11:52:39 |
| 25 | Q.  This may help fast-track this line of | 11:52:40 |

Page 131

| | | |
|---|---|---|
| 1 | asked for an e-mail, you would have to look at that | 11:55:11 |
| 2 | e-mail? | 11:55:14 |
| 3 | A.  Yes, that was the one -- or if I talked to | 11:55:15 |
| 4 | the individual, that I had a name; that I'd put it | 11:55:17 |
| 5 | over here that I talked to A, B, and C, whatever, | 11:55:20 |
| 6 | then I would put it over here. | 11:55:23 |
| 7 | Q.  But sticking -- sticking with the | 11:55:25 |
| 8 | November 5th, 2018, call we're discussing, do you | 11:55:28 |
| 9 | recall the name of the individual with whom you | 11:55:33 |
| 10 | spoke? | 11:55:35 |
| 11 | A.  At this point while looking at this, no. | 11:55:36 |
| 12 | This is an e-mail in this place that I can't recall. | 11:55:39 |
| 13 | Q.  Now, following up on the second part of your | 11:55:42 |
| 14 | statement, unless you looked at the e-mail, to answer | 11:55:45 |
| 15 | that question that I just asked you -- the identity | 11:55:49 |
| 16 | of the individual -- is your response that you would | 11:55:53 |
| 17 | have to look at an e-mail, to the extent an e-mail | 11:55:55 |
| 18 | actually exists? | 11:55:59 |
| 19 | A.  And plus there's no way I can remember three | 11:56:01 |
| 20 | years ago who did I talk to. | 11:56:05 |
| 21 | Q.  I get it.  So as you sit here today, you | 11:56:08 |
| 22 | can't remember when you spoke -- the name of the | 11:56:11 |
| 23 | individual you spoke with on November 5th, 2018, | 11:56:13 |
| 24 | without reviewing some secondary document, whether | 11:56:16 |
| 25 | that's an e-mail or otherwise? | 11:56:19 |

Page 134

```
 1        A.  Right.                                  11:56:23

 2        Q.  That's a fair statement that I just made;  11:56:23

 3   correct?                                          11:56:25

 4        A.  Right, I -- I cannot remember three years  11:56:26

 5   ago who did I talk to.                            11:56:29

 6        Q.  It's not a trick.  I think -- I understand  11:56:30

 7   that.                                             11:56:33

 8            Now, if we go down to November 12th, you see  11:56:33

 9   that you actually provide some specifics from that  11:56:36

10   telephone call; correct?                          11:56:40

11        A.  Yes.                                     11:56:42

12        Q.  And by "specifics" -- because before you  11:56:42

13   told me you didn't know what specifics means -- you  11:56:44

14   see that you actually have the name of the individual  11:56:47

15   you purportedly spoke with; correct?              11:56:50

16        A.  I didn't say that I didn't know what     11:56:53

17   "specific" means.  You've been asking for the     11:56:54

18   substance, as I said, "I don't know what you're   11:56:56

19   talking about."                                   11:56:58

20            If I talked to the individual that I know  11:56:59

21   the name, that I make the note, then I would go and  11:57:01

22   put it in a complaint like this one -- that I put it  11:57:05

23   down exactly.  Who did I talk to, what did I talk to.  11:57:08

24        Q.  So building off of what you just stated, the  11:57:11

25   idea that you spoke with Tony Adams, that would have  11:57:15
```

Page 135

| | | |
|---|---|---|
| 1 | been reflected in your notes? | 11:57:18 |
| 2 | A.  Definitely that's what it was.  That's what | 11:57:21 |
| 3 | I knew -- that Tony Adams -- and I asked for an | 11:57:24 |
| 4 | e-mail, and then he sent me the e-mail. | 11:57:26 |
| 5 | Q.  And, similarly, the fact that you knew Tony | 11:57:29 |
| 6 | Adams provided you with his telephone number, | 11:57:32 |
| 7 | (631) 855-3291, you know of that because of your | 11:57:35 |
| 8 | notes; is that correct? | 11:57:41 |
| 9 | A.  Yes, that's -- that's why I write it down, | 11:57:43 |
| 10 | yes. | 11:57:46 |
| 11 | Q.  All I'm trying to understand is how you | 11:57:46 |
| 12 | come -- how you understand this information.  Okay. | 11:57:48 |
| 13 | And that would have been reflected in your notes? | 11:57:53 |
| 14 | A.  Yes. | 11:57:55 |
| 15 | Q.  And -- now, if we go to November 14th, you | 11:57:57 |
| 16 | see that you provide some specifics here, as well, | 11:58:03 |
| 17 | with an agent named Joseph.  And that Joseph said -- | 11:58:06 |
| 18 | responded by telling -- | 11:58:14 |
| 19 | A.  Me that you're stupid.  Yes, I remember | 11:58:16 |
| 20 | that. | 11:58:18 |
| 21 | Q.  So is that also -- or was that also | 11:58:20 |
| 22 | reflected in your notes? | 11:58:21 |
| 23 | A.  Definitely that one was, and I don't want to | 11:58:24 |
| 24 | go through it because I want to tell you a lot more | 11:58:28 |
| 25 | other stuff, but that's the gist of it. | 11:58:32 |

Page 136

```
 1         Q.  So you don't know exactly who answered the    12:03:12

 2    call; is that a fair statement?                        12:03:14

 3         A.  Right.                                        12:03:16

 4         Q.  You assume it was yourself, but you don't     12:03:16

 5    recall if it was yourself versus your foreman or your  12:03:18

 6    wife?                                                  12:03:22

 7         A.  Yes.                                          12:03:22

 8         Q.  And does the same hold true for all of these  12:03:23

 9    calls, or should we go through the same exercise for   12:03:26

10    each call?                                             12:03:28

11         A.  No, for all of the calls.  As I said, 90      12:03:29

12    percent of the time I'm the one to answer the calls.   12:03:33

13         Q.  And 10 percent of the time you're not.  I     12:03:35

14    understand it.  I now understand it for the fourth     12:03:37

15    time.  But what I'm curious to know is regardless of   12:03:40

16    the allocation in which who answers the phone, all I   12:03:44

17    want to know is as you sit here today as a             12:03:48

18    representative for Abante, if you can testify          12:03:51

19    definitively as to the identity of the person who      12:03:54

20    answered the telephone calls that you've alleged in    12:03:59

21    your complaint?                                        12:04:02

22         A.  I don't remember.                            12:04:03

23         Q.  Okay.  Which is fair.                         12:04:04

24              Now, similarly, if we go to the             12:04:10

25    March 22nd, 2019, call, would you agree with me that   12:04:12
```

Page 141

Fred Heidarpour - March 3, 2021

| | | |
|---|---|---|
| 1 | A.  Yes, sir. | 13:34:05 |
| 2 | Q.  When you received this e-mail from Aleks | 13:34:05 |
| 3 | Meza, is this when you learned of the entity named | 13:34:09 |
| 4 | Triumph Merchant Solutions, LLC? | 13:34:14 |
| 5 | A.  You know, I don't recall.  I don't know. | 13:34:17 |
| 6 | Q.  Prior to this litigation, were you aware of | 13:34:20 |
| 7 | that entity, Triumph Merchant Solutions, LLC? | 13:34:23 |
| 8 | A.  I don't think so. | 13:34:27 |
| 9 | Q.  Have you conducted any research into that | 13:34:28 |
| 10 | entity, Triumph Merchant Solutions, LLC? | 13:34:31 |
| 11 | A.  No, I did not do that.  Not me. | 13:34:34 |
| 12 | Q.  Okay.  Are you aware of having served any | 13:34:37 |
| 13 | subpoenas on Triumph Merchant Solutions, LLC, in this | 13:34:41 |
| 14 | litigation? | 13:34:45 |
| 15 | A.  I don't know.  You'll have to ask my | 13:34:46 |
| 16 | counsel.  I don't know. | 13:34:50 |
| 17 | Q.  Is there a reason -- well, strike that. | 13:34:51 |
| 18 | Is it your belief that Triumph Merchant | 13:34:54 |
| 19 | Solutions, LLC, placed the telephone call that | 13:34:57 |
| 20 | preceded the sending of this e-mail on | 13:35:00 |
| 21 | October 8th, 2019? | 13:35:02 |
| 22 | A.  Do you know what?  Yes, but, again, it's | 13:35:06 |
| 23 | under the same page -- on the top it says | 13:35:09 |
| 24 | "www.totalmerchant.services."  And I don't know how | 13:35:13 |
| 25 | you want to go and separate the Triumph from TMS. | 13:35:17 |

Page 166

Fred Heidarpour - March 3, 2021

| | | |
|---|---|---|
| 1 | MR. SMITH:  Calls for a legal conclusion. | 13:38:48 |
| 2 | BY MR. ZANN: | 13:38:50 |
| 3 | Q.  As it relates to the factual basis for you | 13:38:50 |
| 4 | to allege the use of a Spitfire dialing system, is | 13:38:54 |
| 5 | that an allegation that you learned through your | 13:38:58 |
| 6 | attorneys? | 13:39:01 |
| 7 | A.  A Spitfire, yes.  I learned from them, yes, | 13:39:03 |
| 8 | in the complaint. | 13:39:06 |
| 9 | Q.  So really what I'm getting at is you have no | 13:39:07 |
| 10 | personal knowledge one way or the other whether a | 13:39:10 |
| 11 | Spitfire dialing system was used to call you? | 13:39:13 |
| 12 | A.  No, sir, I do not. | 13:39:16 |
| 13 | Q.  Instead, you just relayed upon whatever | 13:39:17 |
| 14 | research your attorneys conducted to reach that | 13:39:20 |
| 15 | allegation? | 13:39:24 |
| 16 | A.  Right.  After I explained to them the method | 13:39:25 |
| 17 | of the call that I received, they investigated it, | 13:39:27 |
| 18 | and then they find out that the dialing system that | 13:39:29 |
| 19 | they use -- that's the name, Spitfire. | 13:39:33 |
| 20 | Q.  Now, you have an amended your complaint in | 13:39:36 |
| 21 | this action, have you? | 13:39:40 |
| 22 | A.  I'm -- I don't know. | 13:39:43 |
| 23 | Q.  So as far as you know, that allegation is | 13:39:45 |
| 24 | still the allegation in the complaint; that these | 13:39:50 |
| 25 | calls were placed using a Spitfire dialing system? | 13:39:51 |

Page 170

```
 1        A.  I believe that's what the complaint said.    13:39:56

 2        Q.  Why did you sue Triumph Merchant              13:39:59

 3   Solutions, LLC?                                        13:40:04

 4            MR. SMITH:  Objection; calls for --           13:40:04

 5            THE WITNESS:  You have to ask my counsel.     13:40:07

 6   The bottom line is Triumph or whoever was placing the  13:40:08

 7   call, if -- if everything says Total Merchant          13:40:12

 8   Services, I don't understand.  You're working for      13:40:18

 9   Total Merchant Services under a different name.         13:40:19

10   BY MR. ZANN:                                           13:40:23

11        Q.  So, I'm sorry, go ahead.                      13:40:23

12        A.  I'm not an attorney.  And as a reasonable     13:40:25

13   person, when he receives a call and when he receives   13:40:28

14   an e-mail, and even on the e-mail the name says        13:40:32

15   A, B, C, D, but are trying to sell the product of the  13:40:36

16   company of TMS, that -- that -- the TMS -- an          13:40:40

17   individual person, working for TMS on a different      13:40:48

18   name.                                                  13:40:50

19        Q.  And you base that conclusion off of the       13:40:51

20   sheer fact that TMS has an e-mail address -- sorry, a  13:40:53

21   URL contained within this e-mail and maybe on some of  13:41:00

22   the phone calls someone mentioned TMS?                 13:41:05

23            MR. SMITH:  Objection --                      13:41:08

24            THE WITNESS:  No.                             13:41:09

25            MR. SMITH:  -- mischaracterizes the witness'  13:41:10
```

Page 171

Fred Heidarpour - March 3, 2021

```
 1    testimony.

 2    BY MR. ZANN:

 3        Q.  What do you base the conclusion on?

 4        A.  No, no, no, no.  I said earlier that to my      13:41:12

 5    personal knowledge when I talk to the agent that they  13:41:19

 6    are trying to sell the TMS product through the e-mail  13:41:21

 7    that we received.  Even if the e-mail said "Triumph     13:41:24

 8    Merchant Solutions," but on the top of it it says      13:41:28

 9    "Total Merchant Services," that is our belief that     13:41:31

10    they are all working for TMS.                          13:41:34

11    BY MR. ZANN:                                           13:41:36

12        Q.  Okay.  Now, are you aware of any discovery     13:41:37

13    or testimony having been provided by Triumph Merchant  13:41:47

14    Solutions in this action?                              13:41:51

15        A.  No, I'm not.                                   13:41:53

16        Q.  So similarly -- well, strike that.             13:41:56

17            Are you aware of who has been deposed thus     13:42:02

18    far in this action?                                    13:42:07

19        A.  No, I'm not.                                   13:42:09

20        Q.  Are you aware of -- strike that.               13:42:15

21            Now, sticking with this Exhibit 3, if you      13:42:26

22    scroll down to -- I'm not certain what page this is,   13:42:31

23    Abante-000423.                                         13:42:41

24        A.  Yes, sir.                                      13:42:57

25        Q.  Now, you responded to this e-mail from         13:42:57
```

Page 172

| | | |
|---|---|---|
| 1 | A. Yeah, I don't know how many e-mails we | 13:50:18 |
| 2 | provided to you. Where are the documents that we can | 13:50:20 |
| 3 | go through all the e-mails. | 13:50:23 |
| 4 | Q. I will represent to you this is the extent | 13:50:25 |
| 5 | of the Triumph -- this is the earliest in time, the | 13:50:28 |
| 6 | Triumph e-mail thread that you have produced in this | 13:50:30 |
| 7 | litigation. | 13:50:32 |
| 8 | A. Okay. | 13:50:35 |
| 9 | Q. June 24th, that being the first e-mail | 13:50:36 |
| 10 | communication you've produced in this litigation | 13:50:40 |
| 11 | between yourself and Triumph. And "by yourself," | 13:50:42 |
| 12 | again, I'm referring to Abante. | 13:50:45 |
| 13 | A. Okay. | 13:50:47 |
| 14 | Q. With that being said, because this e-mail | 13:50:48 |
| 15 | you sent under the name Fred Pour is not the first in | 13:50:52 |
| 16 | the e-mail thread, that's why I'm giving you the | 13:50:57 |
| 17 | opportunity to answer the question of is there an | 13:51:01 |
| 18 | earlier e-mail wherein you use this name Fred P-o-o-r | 13:51:03 |
| 19 | in communicating with Aleks Meza? | 13:51:08 |
| 20 | A. I don't know. | 13:51:10 |
| 21 | Q. Now, does your wife use that name, Fred | 13:51:15 |
| 22 | Poor, P-o-o-r, in communicating with individuals? | 13:51:21 |
| 23 | A. I don't know. | 13:51:24 |
| 24 | Q. Do you believe your wife uses that name when | 13:51:28 |
| 25 | communicating with individuals? | 13:51:33 |

Page 179

Fred Heidarpour - March 3, 2021

```
 1    Merchant Services and all other entities, or          14:37:18

 2    whatever, that they're working for them, he's going   14:37:20

 3    to tell them to stop it.                              14:37:22

 4         Q.  Well, we'll get to his e-mail in a minute    14:37:24

 5    because maybe that's how you interpreted it, but      14:37:27

 6    those weren't the words he used.                      14:37:30

 7              But, be that as it may, I'm just coming back 14:37:32

 8    to your statement of your main goal being to stop the 14:37:33

 9    telemarketers.  Let you ask you this:  Are you aware  14:37:36

10    that Triumph testified to placing calls on behalf of  14:37:39

11    at least five different entities in the credit card   14:37:41

12    processing industry?                                  14:37:45

13         A.  No, I did not.                               14:37:46

14         Q.  Are you aware that Mr. Judy also testified   14:37:47

15    to placing telephone calls on behalf of multiple      14:37:49

16    entities in the credit card processing industry?      14:37:53

17              MR. SMITH:  Objection; mischaracterizes the 14:37:56

18    evidence.                                             14:37:58

19              MR. ZANN:  We can agree or disagree on it   14:37:59

20    because I think you're wrong, Taylor.                 14:38:02

21    BY MR. ZANN:                                          

22         Q.  But, nonetheless, are you aware of that,     14:38:04

23    Mr. Heidarpour?                                       14:38:05

24         A.  No, I'm not.                                 14:38:06

25         Q.  So the reason I ask you that is just assume  14:38:08
```

Page 219

```
1    with me that that testimony is accurate; that Triumph    14:38:11

2    was placing telephone calls on behalf of five            14:38:15

3    different entities in the credit card processing         14:38:17

4    industry.  That's why I posed the last question.  If     14:38:20

5    your goal is to stop the telemarketers.  And if it's     14:38:24

6    true that Triumph, as they testified under oath, is      14:38:27

7    placing calls on behalf of other entities in the         14:38:30

8    credit card processing industry, that your suit          14:38:34

9    against Total Merchant will not in and of itself stop    14:38:37

10   Triumph from engaging in calling activity?               14:38:40

11          MR. SMITH:  Objection; asked and answered;        14:38:43

12   and calls for speculation.                               14:38:44

13          THE WITNESS:  Triumph, they did not               14:38:47

14   represent any other company when they called me or       14:38:50

15   they send me the e-mail.  It was just Total Merchant      14:38:54

16   Services.                                                14:38:58

17   BY MR. ZANN:                                             14:38:58

18      Q.  And how do you know who Triumph did or did        14:38:58

19   not represent at the time they called you?               14:39:00

20      A.  I don't know.  All I know is that when --          14:39:03

21   when we were talking to them, they were representing     14:39:05

22   the TMS.  When they sent the e-mail, they were            14:39:07

23   talking about TMS.                                       14:39:11

24      Q.  But you just made a statement that Triumph         14:39:12

25   was not doing something.  And I'm asking you what is     14:39:14
```

                                                    Page 220

Fred Heidarpour - March 3, 2021

```
 1        A.  No, sir.                                    15:22:42

 2        Q.  Are you aware of any control TMS exerted of  15:22:42

 3   the business practices of Judy?                      15:22:44

 4        A.  No, sir.                                    15:22:46

 5        Q.  And rounding this out, are you aware of any  15:22:47

 6   control Triumph exhibited over the business practices 15:22:48

 7   of Judy?                                             15:22:55

 8        A.  No.                                         15:22:56

 9        Q.  And are you aware of any authority TMS      15:22:56

10   provided Triumph to place telephone calls?          15:23:00

11        A.  No.  All I know is that they looked like    15:23:05

12   they had been working for them.                     15:23:08

13        Q.  But beyond those e-mails that you've reached 15:23:10

14   that conclusion, are you aware of any explicit      15:23:12

15   authority that TMS provided to Triumph to place     15:23:15

16   telephone calls?                                    15:23:18

17        A.  No.                                         15:23:19

18        Q.  Okay.  And, similarly, are you aware of any  15:23:19

19   authority TMS provided to Judy to place telephone   15:23:22

20   calls?                                              15:23:25

21        A.  No.                                         15:23:26

22        Q.  And rounding this out, are you aware of any  15:23:26

23   authority Triumph -- sorry, are you aware of any    15:23:29

24   authority Triumph had over Judy to place telephone  15:23:32

25   calls?                                              15:23:37
```

Page 248

Fred Heidarpour - March 3, 2021

```
 1        Q.  How often?                              15:31:28

 2        A.  We had many.                            15:31:32

 3        Q.  Okay.  And how would you define "many"? 15:31:34

 4        A.  Oh, last three, four years we have many.  I  15:31:37

 5   don't recall right now how many, but it was a     15:31:45

 6   handful.                                          15:31:48

 7        Q.  Would you be surprised if I told you since  15:31:49

 8   January of 2015 it was over 100 lawsuits that Abante  15:31:52

 9   has filed?                                        15:31:57

10        A.  No, it doesn't surprise me.             15:31:57

11        Q.  And with that being said, of those over 100,  15:32:00

12   how many would you say Andrew represented Abante on?  15:32:04

13        A.  That's what I'm saying is it was a handful;  15:32:08

14   not all of them.                                  15:32:10

15        Q.  And why is Andrew not representing you in  15:32:12

16   this litigation?                                  15:32:16

17        A.  I don't know.  He had some other things to  15:32:17

18   do.  I don't have any idea why he -- why he doesn't  15:32:20

19   do that.                                          15:32:23

20        Q.  Well, I guess the question would be did  15:32:25

21   Abante seek to retain Andrew to retain its interests  15:32:26

22   in this lawsuit?                                  15:32:29

23        A.  We talked -- we talked, and he helped me and  15:32:31

24   all of this stuff, but, no.                       15:32:33

25        Q.  And should this lawsuit result in a     15:32:36
```

Page 255

```
 1          Q.   Okay.  So the award was 20,000 but you only    16:02:26

 2    received 10,000 of the 20,000?                            16:02:29

 3          A.   Right.  Because the other -- I believe the     16:02:31

 4    agreement that they had was something that -- they        16:02:34

 5    went through bankruptcy or something they couldn't        16:02:38

 6    pay it.                                                   16:02:40

 7          Q.   No, I understand now.                          16:02:42

 8               Now, going down to the third -- I guess        16:02:44

 9    we'll call it the third paragraph starting with, "If      16:02:49

10    no amount is recovered."                                  16:02:51

11          A.   Yes.                                           16:02:54

12          Q.   Do you see that language?                      16:02:54

13          A.   Yes.                                           16:02:55

14          Q.   Do you interpret that language as meaning if   16:02:56

15    there is no recovery Abante will not be obligated to      16:02:58

16    make any payments to the attorneys?                       16:03:02

17          A.   Yes.                                           16:03:06

18          Q.   And by "payments" that also includes the       16:03:07

19    attorney's fees as well as costs and expenses of the      16:03:09

20    litigation?                                               16:03:12

21          A.   Right.                                         16:03:13

22          Q.   So is it a fair statement that as of right     16:03:13

23    now, Abante has not paid any money to its attorneys       16:03:16

24    representing its interest in this litigation?             16:03:20

25          A.   Right.                                         16:03:24
```

Veritext Legal Solutions
303-988-8470

Fred Heidarpour - March 3, 2021

```
 1      Q.  Approximately two weeks before the lawsuit    16:05:45

 2   was filed on September 11th, 2019?                   16:05:48

 3      A.  If you say that, yes.                          16:05:51

 4      Q.  Well, I mean, I'm not the best at --           16:05:53

 5      A.  I don't -- I don't have it in front of me,    16:05:56

 6   but if you say that's the case, yes.                 16:05:58

 7      Q.  This purports to be an eSignature; is that    16:06:00

 8   correct?                                              16:06:04

 9      A.  Yes.                                           16:06:05

10      Q.  Who placed this eSignature on the document?   16:06:06

11      A.  What do you mean?  I did it.                   16:06:09

12      Q.  You did it?                                    16:06:11

13      A.  Yeah, I believe -- I don't know if it's a --  16:06:13

14   whatever document that it was, I signed it on the -- 16:06:16

15   on the top, and then the name it says put it here.  I 16:06:19

16   put it there.                                        16:06:23

17      Q.  Okay.  But that was my question.  The         16:06:24

18   individual who actually signed it was yourself,      16:06:25

19   Mr. Heidarpour?                                       16:06:28

20      A.  Yes.                                           16:06:30

21      Q.  You can close the exhibit out.  We're done    16:06:35

22   with that one.                                        16:06:37

23          Mr. Heidarpour, are you aware that a          16:06:38

24   mediation has already occurred in this litigation?   16:06:40

25      A.  No.                                            16:06:44
```

Page 284

```
 1        Q.   Okay.  Okay.                              16:06:44

 2        A.   I heard it -- I believe it was -- when was  16:06:46

 3   it?  Let me think for one second.  I heard it but a   16:06:49

 4   couple of cancellations or something that happened,    16:06:56

 5   but I don't know the end -- what was in the end.        16:06:58

 6        Q.   And was there a reason why you were not      16:07:04

 7   present at that mediation?                              16:07:06

 8        A.   As I said, I believe it was a couple of the  16:07:07

 9   dates -- as I said, my plan -- I'm part in             16:07:11

10   California, and I'm part in Arizona.  And in last       16:07:15

11   October, November, December of last year I was in      16:07:19

12   Virginia.  I think it was some kind of conflict of     16:07:22

13   the schedule.  That's why it happened that I was not   16:07:26

14   there.                                                  16:07:31

15        Q.   Give me one minute just to check my topics   16:07:34

16   here.  We might be done.  Give me one second,          16:07:38

17   Mr. Heidarpour.                                         16:07:41

18            Mr. Heidarpour, what portion of Abante's      16:08:05

19   revenue is generated through TCPA litigation?          16:08:10

20        A.   Less than 5 percent --

21            MR. SMITH:  Object to --

22            THE WITNESS:  Less than 5 percent, 7

23   percent, something like that.

24            THE REPORTER:  I didn't hear your objection.  16:08:15

25            MR. SMITH:  Just irrelevant.                  16:08:15
```

                                                    Page 285

# EXHIBIT E

 **AT&T**

ABANTE ROOTER & PLUMBING
ATTN: FRED HEIDARPOUR
38560 N 101ST ST
SCOTTSDALE, AZ 85262-3097

| | |
|---|---|
| **Page:** | 1 of 30 |
| **Bill Cycle Date:** | 10/20/18 - 11/19/18 |
| **Account:** | 287260311186 |
| **Foundation Account:** | FAN 05808104 |
| **Invoice:** | 287260311186X11272018 |

Visit us online at: **www.att.com/business**

# Wireless Statement

## Bill-At-A-Glance

| | |
|---|---|
| Previous Balance | $718.58 |
| Payment - 11/12 - Thank You! | $718.58CR |
| Adjustments | $0.00 |
| Balance | $0.00 |
| New Charges | $718.58 |
| **Amount to be Debited** | **$718.58** |
| AutoPay will Debit Your Card by | Dec 12, 2018 |

## Service Summary

| Service | Page | Total |
|---|---|---|
|  Wireless | 1 | $718.58 |
| **Total New Charges** | | **$718.58** |

**Manage Your Account:**
Online: att.com/myatt
Mobile App: att.com/myattapp
Support: 800 331-0500 or 611 from your mobile device
TTY: 866 241-6567

For Important Information about your bill, please see the **News You Can Use** section (Page 29).

## Wireless

**Wireless Summary**

| 14 Wireless Telephone Numbers | | Total Charges | Page |
|---|---|---|---|
| 209 383-3803 | AVANTE PLUMBING | 27.36 | 3 |
| 510 351-5154 | WIRELESS FORWARD | 33.14 | 5 |
| 510 385-5520 | FRED HEIDMARPOUR | 59.44 | 7 |
| 510 385-7447 | FRED HEIDARPOUR | 70.24 | 9 |
| 510 385-9645 | FRED HEIDARPOUR | 154.44 | 11 |
| 510 459-6147 | ABANTE ROOTER & PLUMBING | 36.35 | 13 |
| 510 534-1636 | ABANTE ROOTER & PLUMBING | 53.14 | 15 |
| 510 534-7590 | ABANTE ROOTER & PLUMBING | 33.14 | 17 |
| 510 540-7210 | ABANTE ROOTER & PLUMBING | 30.60 | 19 |
| 925 253-0106 | ABANTE ROOTER | 33.14 | 21 |
| 925 256-7511 | ABANTE ROOTER | 33.14 | 23 |
| 925 766-7255 | FRANKLIIN MARIN | 59.44 | 25 |
| 925 828-1080 | ABANTE ROOTER & PLUMBING | 33.14 | 27 |
| 925 895-7551 | ABANTE ROOTER & PLUMBING | 61.87 | 29 |
| Total | | 718.58 | |

**Group 2 - Data Summary - Oct 20 thru Nov 19**

**AT&T Unlimited Plus Multi Line for Business -** Includes unlimited domestic wireless data, talk and text on an eligible device. After 22GB of data usage, AT&T may slow speeds. Includes up to 10GB of tethering/line on an eligible device. After 10GB, tethering usage is slowed to max of 128 Kbps. Stream Saver included. Additional monthly access charge applies for each device. Eligible for $10 auto-pay discount. Discount is applied within in 1 to 2 bill cycles. Other restrictions apply.  See att.com/abs-additional-terms for plan details.

| | Data Used (GB) |
|---|---|
| 209 383-3803 | 0.00 |
| 510 385-5520 | 12.05 |
| 510 385-7447 | 1.26 |
| 510 385-9645 | 31.54 |
| 510 459-6147 | 2.20 |
| 510 540-7210 | 0.00 |
| 925 766-7255 | 7.63 |
| 925 895-7551 | 13.46 |
| **Total** | **68.12** |

**Group 3 - Data Summary - Oct 20 thru Nov 19**

**Mobile Share Value 300MB with Rollover Data -** Includes 300 megabytes with plan.  Data Overage charge is $20/300MB. Additional plan details available for Consumer customers at

Wireless Services provided by AT&T Mobility, LLC.

Printed on Recyclable Paper

---

**Your Card will be Debited on or after: Dec 12, 2018**    $718.58

**AT&T**

Account Number **287260311186**

ABANTE ROOTER & PLUMBING
ATTN: FRED HEIDARPOUR
38560 N 101ST ST
SCOTTSDALE, AZ 85262-3097

AT&T MOBILITY
PO Box 6463
Carol Stream, IL 60197-6463

**Exhibit
0013**

9990028726031118600000000071858000000071858007

ABANTE000001

# EXHIBIT F

 Gmail

**fred poor <fredpour60@gmail.com>**

---

## Free Credit Card Terminal
2 messages

---

**Aleks Meza** <AMEZA@triumphmsp.com>　　　　　　　　　　　　Tue, Oct 8, 2019 at 9:47 AM
To: fred poor <fredpour60@gmail.com>

Hello,

Thank you for taking the time to speak with me today and giving me the chance to earn your business. As we spoke about on the phone, we can set you up with a brand new Ingenico iCT220 for free with no out of pocket costs to you. The processing rate would be 0.5% and .10 cents per transaction.

The Ingenico iCT220 is a state of the art credit card processing machine that is EMV compliant and Apple Pay ready. Our equipment is plug and play ready so as soon as you receive it you can plug it in and start earning money. EMV will be required by October of 2015 to be in compliance with credit card industry regulations, and Apple Pay is currently one of the newest features for customers with iPhone to pay with.







Our Ingenico iCT220 has a service charge of $5.00 per month to take care of account maintenance. This gives you access to 24/7 customer service and tech support to assure you can reach us when needed.

The fees are as follows:
0.5% Processing Rate
$0.10 Cents per Transaction
$5.00 Monthly Service Fee
$0.25 Cents Batch out Fee
$7.95 Monthly PCI Compliance Fee (Waived for the first year of service)

Free Equipment
Free Shipping
Free Activation
Next Day Funding
No Set up Fee

ABANTE000419

No Application Fee

Taking advantage of this promotion is very easy. You can call me back and I can take a brief five minute application over the phone.

https://www.totalmerchantservices.com/



## Merchant Account Services - Best Credit Card Processing Company to Accept Credit Cards | Total Merchant Services

Setting Up a Merchant Account with Us Is Easy! Our merchant accounts enable you to accept credit cards and other payment types. Once you complete an application and your merchant account is approved, we'll send you equipment already programmed for your needs.

www.totalmerchantservices.com

## Aleks Meza

Account Manager

2305 Historic Decatur Rd, Ste 100, San Diego CA 92106

**Triumph Merchant Solutions**

☎ (858) 225-4580 Ext.314 & Ext.100
✉ ameza@triumphmsp.com
**Fax** 1(888) 316-7994
**Office Hours:** M - F 7:00 AM - 4:00 PM PST



The content of this message is the proprietary and confidential property of Triumph Merchant Solutions, LLC, and should be treated as such. If you are not the intended recipient and have received this message in error, please delete this message from your computer system and notify me immediately by reply e-mail. Any unauthorized use or distribution of the content of this message is prohibited. Thank you.

Please consider the environment before printing this email.

ABANTE000420



ABANTE000421

 **Gmail**

**fred poor <fredpour60@gmail.com>**

## Free Credit Card Terminal
6 messages

**Aleks Meza** <AMEZA@triumphmsp.com>                       Mon, Jun 24, 2019 at 3:07 PM
To: "fredpour60@gmail.com" <fredpour60@gmail.com>

Hello Sarday,

Thank you for taking the time to speak with me today and giving me the chance to earn your business. As we spoke about on the phone, we can set you up with a brand new wireless Ingenico iWL250 for free with no out of pocket costs to you. **The processing rate would be 0.5% and .10 cents per transaction.**

The Ingenico iWL250 is a state of the art credit card processing machine that is EMV compliant and Apple Pay ready. Our equipment is plug and play ready so as soon as you receive it you can plug it in charge it and once it is charged start earning money. EMV will be required by October of 2015 to be in compliance with credit card industry regulations, and Apple Pay is currently one of the newest features for customers with iPhone to pay with. With our wireless terminal you will not miss a payment as it has a sim card that allows it to pick up service anywhere in the United States.

  
 

Our Ingenico iWL250 has a **service charge of $25 per month** to take care of account maintenance. This gives you access to 24/7 customer service and tech support to assure you can reach us when needed.

Free Equipment
Free Shipping
Free Activation
Next Day Funding
No Set up Fee
No Application Fee

For Example: $100 transaction x 0.5% processing rate = 0.50 cents + 0.10 cents per transaction = 0.60 cents for every $100 transaction that you do.

ABANTE000422

Taking advantage of this promotion is very easy. You can call me back and I can take a brief five minute application over the phone.

[www.totalmerchantservices.com](www.totalmerchantservices.com)



### Total Merchant Services - Merchant Account Services

Comprehensive Sales and Payment Processing Solutions. Since 1996, Total Merchant Services has helped 500,000+ businesses with their payment needs.

[www.totalmerchantservices.com](www.totalmerchantservices.com)

## Aleks Meza

Account Manager

2305 Historic Decatur Rd, Ste 100, San Diego CA 92106

**Triumph Merchant Solutions**

📞 (858) 225-4580 Ext.314 & Ext.100
✉️ [ameza@triumphmsp.com](ameza@triumphmsp.com)
**Fax** 1(888) 316-7994



The content of this message is the proprietary and confidential property of Triumph Merchant Solutions, LLC, and should be treated as such. If you are not the intended recipient and have received this message in error, please delete this message from your computer system and notify me immediately by reply e-mail. Any unauthorized use or distribution of the content of this message is prohibited. Thank you.

Please consider the environment before printing this email.

---

**fred poor** <fredpour60@gmail.com>             Mon, Jun 24, 2019 at 3:06 PM
To: Aleks Meza <AMEZA@triumphmsp.com>

I can not access the website. What is your website? can you give me a link.

[Quoted text hidden]

---

**Aleks Meza** <AMEZA@triumphmsp.com>             Mon, Jun 24, 2019 at 3:12 PM
To: fred poor <fredpour60@gmail.com>

ABANTE000423

Yes, it is https://totalmerchantservices.com/

# Aleks Meza

Account Manager

2305 Historic Decatur Rd, Ste 100, San Diego CA
92106

**Triumph Merchant Solutions**

📞 (858) 225-4580 Ext.314 & Ext.100

✉ ameza@triumphmsp.com

**Fax** 1(888) 316-7994



The content of this message is the proprietary and confidential property of Triumph Merchant Solutions, LLC, and should be treated as such. If you are not the intended recipient and have received this message in error, please delete this message from your computer system and notify me immediately by reply e-mail. Any unauthorized use or distribution of the content of this message is prohibited. Thank you.

Please consider the environment before printing this email.

---

**From:** fred poor <fredpour60@gmail.com>
**Sent:** Monday, June 24, 2019 3:06 PM
**To:** Aleks Meza
**Subject:** Re: Free Credit Card Terminal

[Quoted text hidden]

**Aleks Meza** <AMEZA@triumphmsp.com>                                Wed, Jun 26, 2019 at 9:42 AM
To: fred poor <fredpour60@gmail.com>

Good day Ms. Sarday,

I'm just following up with you today. Were you able to review the information that I sent you?

Tell me what you think about it. Do you think this would benefit your business?

Hope to hear from you soon!

Thank you and great day!

# Aleks Meza

Account Manager

ABANTE000424

2305 Historic Decatur Rd, Ste 100, San Diego CA
92106
**Triumph Merchant Solutions**

☎ (858) 225-4580 Ext.314 & Ext.100

✉ ameza@triumphmsp.com

**Fax** 1(888) 316-7994



The content of this message is the proprietary and confidential property of Triumph Merchant Solutions, LLC, and should be treated as such. If you are not the intended recipient and have received this message in error, please delete this message from your computer system and notify me immediately by reply e-mail. Any unauthorized use or distribution of the content of this message is prohibited. Thank you.

Please consider the environment before printing this email.

---

**From:** fred poor <fredpour60@gmail.com>
**Sent:** Monday, June 24, 2019 3:06 PM
**To:** Aleks Meza
**Subject:** Re: Free Credit Card Terminal

[Quoted text hidden]

---

fred poor <fredpour60@gmail.com>          Wed, Jun 26, 2019 at 9:48 AM
To: Aleks Meza <AMEZA@triumphmsp.com>

Do not contact me.
[Quoted text hidden]

---

Aleks Meza <AMEZA@triumphmsp.com>        Wed, Jun 26, 2019 at 9:55 AM
To: fred poor <fredpour60@gmail.com>

Why is that? You're no longer interested? Or what can we do in order to earn your business?

## Aleks Meza

Account Manager

2305 Historic Decatur Rd, Ste 100, San Diego CA
92106
**Triumph Merchant Solutions**

☎ (858) 225-4580 Ext.314 & Ext.100

✉ ameza@triumphmsp.com

**Fax** 1(888) 316-7994

ABANTE000425



The content of this message is the proprietary and confidential property of Triumph Merchant Solutions, LLC, and should be treated as such. If you are not the intended recipient and have received this message in error, please delete this message from your computer system and notify me immediately by reply e-mail. Any unauthorized use or distribution of the content of this message is prohibited. Thank you.

Please consider the environment before printing this email.

---

**From:** fred poor <fredpour60@gmail.com>
**Sent:** Wednesday, June 26, 2019 9:48 AM
[Quoted text hidden]

[Quoted text hidden]

ABANTE000426

 **Gmail**

**fred poor <fredpour60@gmail.com>**

## Free Phone Swipe for Credit Cards
1 message

**Aleks Meza** <AMEZA@triumphmsp.com>                          Mon, Jun 24, 2019 at 3:11 PM
To: "fredpour60@gmail.com" <fredpour60@gmail.com>

Hello Sarday,

Thank you for taking the time to speak with me today and giving me the chance to earn your business. As we spoke about on the phone, we can set you up with a brand new Pay Anywhere Phone Swipe for free with no out of pocket costs to you. The processing rate would be 0.5% rate and 0.10 cents per transaction.

The Pay Anywhere Phone Swipe is a state of the art credit card processing machine that is EMV compliant, Apple Pay & Google Wallet ready. Our equipment is plug and play ready so as soon as you receive it you can plug it in and start earning money. EMV will be required by October of 2015 to be in compliance with credit card industry regulations, and Apple Pay & Google Wallet is currently one of the newest features for customers with iPhones or Smart phones to pay with.



Our Pay Anywhere Phone Swipe has a **service charge of $10 per month** to take care of account maintenance. This gives you access to 24/7 customer service and tech support to assure you can reach us when needed.

- Free Equipment

ABANTE000427

Gmail - Free Mobile Swipe for Credit Cards

- Free Shipping
- Free Activation
- Next Day Funding Available
- NO Set Up Fees
- NO Application Fees

Taking advantage of this promotion is very easy. You can call me back and I can take a brief five minute application over the phone.

www.totalmerchantservices.com



## Total Merchant Services - Merchant Account Services

Comprehensive Sales and Payment Processing Solutions. Since 1996, Total Merchant Services has helped 500,000+ businesses with their payment needs.

www.totalmerchantservices.com

### Aleks Meza

Account Manager

2305 Historic Decatur Rd, Ste 100, San Diego CA 92106

**Triumph Merchant Solutions**

📞 (858) 225-4580 Ext.314 & Ext.100
✉ ameza@triumphmsp.com
**Fax** 1(888) 316-7994



The content of this message is the proprietary and confidential property of Triumph Merchant Solutions, LLC, and should be treated as such. If you are not the intended recipient and have received this message in error, please delete this message from your computer system and notify me immediately by reply e-mail. Any unauthorized use or distribution of the content of this message is prohibited. Thank you.

Please consider the environment before printing this email.

ABANTE000428